[No. 48937–8.   En Banc.   June 23, 1983.]

WASHINGTON FEDERATION OF STATE EMPLOYEES, COUNCIL 28, AFL–CIO, *Petitioner*, v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*Douglas P. Wyckoff* (of *Cordes, Cordes & Younglove*), for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *James K. Pharris, Assistant,* for respondents.

WILLIAMS, C.J.—This matter came before the court on an emergency motion for discretionary review and injunctive relief. Petitioner, Washington Federation of State Employees, Council 28, AFL–CIO (WFSE), asked this court to enjoin respondents from implementing their announced plans to delay the payment of salaries to state employees and officers, described in the pleadings as the "lagged payroll" plan. On August 24, 1982, then Chief Justice Robert F. Brachtenbach heard oral argument on the motion and, pursuant to RAP 8.3, granted the requested relief by enjoining implementation of the lagged payroll plan until the matter could be reviewed by the en banc court. Follow-

ing oral argument to the en banc court on September 7, 1982, we filed an order dissolving the preliminary injunction and requiring that a trial be held in Thurston County Superior Court within 30 days of that date to resolve the remaining issues. With this opinion, we now set forth the reasons for that order.

On July 16, 1982, Governor John Spellman wrote a letter to all Washington state employees to inform them that effective August 31, 1982, the State would implement a new "lagged payroll" method of payment. This system was to change the traditional payday from the last working day of each month to approximately the 10th day of the following month. The Governor's stated purpose for shifting to a lagged payroll system was to permit the State of Washington to realize an anticipated $4 million profit by investing state employees' salaries for an additional 10–day period.[1] Also on July 16, 1982, Governor Spellman wrote to numerous financial institutions in Washington to inform them of the proposed lagged payroll plan. The letter asked for their cooperation in accommodating state employees during the transition to the lagged payroll system by adjusting payment due dates whenever possible.

Later that same day, July 16, 1982, petitioner WFSE commenced suit in Thurston County Superior Court requesting that the proposed lagged payroll system be declared unlawful and unconstitutional. Petitioner also requested preliminary injunctive relief to preserve the existing method of payment of state employees' salaries until the court could consider and determine the legal issues presented in the complaint.

On August 9, 1982, Thurston County Superior Court Judge Gerry L. Alexander heard the matter on the parties'

---

[1]Specifically, Governor Spellman's letter stated, in part: "[L]agging the payroll will yield $4 million for the remainder of this biennium—$4 million that, by legislative mandate, I must find and that could otherwise be found only by mandatory temporary or permanent additional reductions in personnel, programs, and/or incremental and merit pay increases." (Italics omitted.) Letter dated July 16, 1982, from Governor Spellman to all state employees. Clerk's Papers, at 7.

cross motions for summary judgment. The court found the lagged payroll proposal did not unconstitutionally impair state employees' private contracts because the State did not act affirmatively to impair such contracts. Accordingly, an order of partial summary judgment was entered in favor of respondents on that issue. No appeal was taken as to that determination. The court went on to consider the legality of the proposed lagged payroll system in light of RCW 42.16-.010 and RCW 42.16.017.[2] After determining a lagged payroll system was authorized under the statutes, the court found questions of fact remained to be determined at trial. These issues centered on whether any alternative lagged payroll system could achieve the same or better payroll accounting efficiency goals without also creating undue hardship to state employees and a windfall profit to the State. Because of these factual issues, the matter was continued for further proceedings so that the record could be supplemented with affidavits bearing on these issues.

On August 20, 1982, the matter was again considered by Judge Alexander. During the interim period, both sides submitted affidavits detailing the costs and expected savings of the lagged payroll plans proposed by each. (WFSE proposed a lagged payroll calling for paydays twice per month.) In the interests of efficiency, both sides permitted

---

[2] RCW 42.16.010 reads as follows:

"The salaries of all state officers and employees shall be paid monthly on the last day of each month unless the director of financial management shall establish different dates in accordance with RCW 42.16.017: *Provided,* That the director of financial management may adopt or authorize adoption of semimonthly or more frequent payment schedules for state agencies, in his discretion: *And provided further,* That schedules for the payment of compensation more often than semimonthly may be adopted only upon the written requests of state agencies, and only for the purpose of conforming state payment schedules for classes of employees in specific trades or occupations to customary schedules prevailing in private industries."

RCW 42.16.017 reads as follows:

"To facilitate payroll preparation and accounting, or to implement the provisions of RCW 42.16.010 through 42.16.017, the director of financial management may adopt customary and necessary procedures including the establishment of pay dates at reasonable times following periods in which payment is earned."

the court to rule without live testimony based upon the affidavits alone. The court first restated its determination that a change to a lagged payroll system was authorized under RCW 42.16.010, in conjunction with RCW 42.16.017. The court then held that although Governor Spellman's letter contemplated implementation of the lagged payroll plan for an unauthorized purpose—to raise additional revenues—it also had the authorized effect of facilitating payroll and accounting efficiencies. Therefore, the lagged payroll plan was found to be consistent with the statutory requirements authorizing such action. Petitioner's request for preliminary injunctive relief was denied because the court found that respondents would likely prevail on the merits, both sides would suffer irreparable harm if the other prevailed, and petitioner had failed to make a sufficient showing of harm to warrant injunctive relief.

Petitioner WFSE filed a motion for discretionary review in this court on August 23, 1982. On August 24, 1982, then Chief Justice Brachtenbach heard oral argument on petitioner's motion for discretionary review and request for preliminary injunctive relief. In an order filed that same day, the Chief Justice granted the motion for discretionary review and, pursuant to RAP 8.3, enjoined implementation of the proposed lagged payroll plan until further order of the court. The order also called for briefing and supporting documentation on the questions of: (1) whether the preliminary injunction should be continued by the en banc court; and (2) the necessity and amount of any bond which might be required of petitioner.

To begin, we point out that the ruling of then Chief Justice Brachtenbach enjoining implementation of the lagged payroll plan was based upon RAP 8.3, which provides:

> Except when prohibited by statute, *the appellate court has authority to issue orders,* before or after acceptance of review, *to insure effective and equitable review, including authority to grant injunctive or other relief . . .*

(Italics ours.) The purpose of the above rule is to permit appellate courts to grant preliminary relief in aid of their appellate jurisdiction so as to prevent destruction of the fruits of a successful appeal. *See In re Koome*, 82 Wn.2d 816, 514 P.2d 520 (1973); *Shamley v. Olympia*, 47 Wn.2d 124, 286 P.2d 702 (1955). That is precisely what the order enjoining implementation of the lagged payroll plan accomplished. At the time of his emergency ruling, the Chief Justice did not have available to him the trial court's written order, the trial court's oral rulings, or the benefit of legal briefing by the parties. By issuing an order enjoining the proposed change to a lagged payroll system pursuant to RAP 8.3, the Chief Justice merely preserved the status quo in order to insure effective and equitable review by the en banc court. Since the issues now before the court are here upon the referral of the Chief Justice, we treat this matter as an appeal in the nature of a motion to modify his preliminary ruling. *See* RAP 17.7.

We take this opportunity to emphasize that our decision is in no way meant to resolve the merits of the underlying lawsuit between petitioner and respondents. Nor is our decision meant to indicate a preference for one payroll method over another. Those issues are not before us. Instead, our decision is limited to deciding whether or not the trial judge abused his discretion in denying preliminary injunctive relief to petitioner WFSE because it failed to meet the requirements of the injunction statute, RCW 7.40.020.[3]

---

[3]We specifically note that our decision in this case is intended only to resolve the issues between the parties now before us. Although Justice Stafford's dissenting opinion at pages 901–02 contains an argument regarding the state constitutional pay protections afforded to certain state officers, we must point out that those state officers are neither represented by petitioner WFSE, nor are they parties to this lawsuit. Therefore, such considerations are irrelevant to the case before us. We express no view on the propriety of the lagged payroll system as applied to those state officers covered by Const. art. 3, § 25 and Const. art. 28, § 1 as amended by Const. art. 30, § 1.

# I

## MOTION FOR RECEIPT OF ADDITIONAL EVIDENCE ON REVIEW

As a preliminary matter, we must dispose of respondents' motion to allow additional evidence on review. The additional evidence offered consists of: (1) a memorandum and order of Joe Taller, Director of the Office of Financial Management, dated August 26, 1982, directing all state agencies to implement the proposed lagged payroll plan; and (2) an administrative order of Mr. Taller regarding promulgation and adoption of WAC 82–50, establishing emergency rules for implementation of the lagged payroll plan, along with a notice of intention to adopt permanent rules in accordance with RCW 34.04.025.

Additional evidence on review may be taken by an appellate court, pursuant to RAP 9.11(a), if the following criteria are met:

> The appellate court may only on its own initiative direct that additional evidence be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through post–judgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

The above rule permits the taking of new evidence only if all six conditions are met, and then only on the court's own initiative.[4] Although a literal reading of the rule suggests

---

[4]On page 896 of his dissenting opinion, Justice Stafford misstates the majority's position regarding RAP 9.11(a). The opinion does not concede the six conditions of the rule were not met. Rather, the majority opinion concedes only that the requirement that additional evidence be taken "on our own initiative" was not met. In fact, after altering the requirements of the rule to allow respondents to move for the receipt of additional evidence, we granted the motion only upon determining that the six conditions of RAP 9.11(a) were satisfied.

respondents' motion for receipt of additional evidence cannot be entertained, this court may waive or alter the provisions of any Rule of Appellate Procedure in order to serve the ends of justice. RAP 1.2 and 18.8. Therefore, despite the language of RAP 9.11(a) which indicates that additional evidence may be considered only on our own initiative, we shall alter the provisions of the rule in this case to consider respondents' motion in light of the other six requirements of RAP 9.11(a). *See also* Washington State Bar Ass'n, *Washington Appellate Practice Handbook* § 15.16 (1980).

This case presents a rather unusual situation in that the additional evidence submitted by respondents was created after initiation of this lawsuit and in anticipation of oral argument before the en banc court. Nonetheless, we think those documents are necessary to fairly resolve the issues on review. This is because under RCW 42.16.010 and RCW 42.16.017, the Director of Financial Management is the only state official authorized to establish pay dates at times other than the last day of each month. Even then, he can do so only to facilitate payroll preparation and accounting, and only if he follows the procedures set out in RCW 42.16.017. Since no other state official, including the Governor, can change the pay date to implement the lagged payroll system, Mr. Taller's order and supporting documentation are critical to the decision of this case.

It appears quite reasonable to excuse respondents' failure to present this evidence to the trial court because of the emergency circumstances of this case. This lawsuit was initiated on July 16, 1982, in immediate response to the Governor's announcement that a lagged payroll system would be implemented in August of 1982. As of that time, the Director of Financial Management was still gathering information from state agencies necessary to the issuance of the order. At no time was the lack of an order challenged in superior court. In fact, the trial judge indicated in his oral decision of August 9, 1982, that for purposes of his ruling he would assume the Office of Financial Management would attempt to implement the lagged payroll system. It

was not until the emergency hearing on August 24, 1982, that the issue of the necessity for documenting the Director of Financial Management's decision to change the payroll date was first raised by then Chief Justice Brachtenbach. Respondents' motion for receipt of additional evidence on review is aimed at correcting this procedural deficiency which apparently was overlooked until brought to the attention of the parties by the Chief Justice.

We think it would be inequitable to prevent introduction of this additional evidence merely because petitioner filed its complaint before the Director of Financial Management had the opportunity to act. The filing of petitioner's lawsuit did not foreclose Mr. Taller from later acting in accordance with his statutory authority. Further, it is no answer to respondents' motion to say the evidence is too late because it was created for the benefit of this court. The documents are consistent with the arguments previously made by respondents and simply memorialize the decision of the Director of Financial Management to institute the proposed lagged payroll plan.

Finally, we believe recognition of the additional evidence submitted by respondents will serve the goal of judicial economy. Without these documents, which are essential to the implementation of the lagged payroll plan, petitioner would have nothing to enjoin. The proper remedy would be to dismiss this case as premature since without concrete steps taken by the Director of Financial Management to install the lagged payroll system, this would be merely a hypothetical dispute. Obviously, such a remedy would be inadequate and cause undue delay and expense to both parties. Mr. Taller undoubtedly would file new orders regarding the lagged payroll system and petitioner WFSE undoubtedly would file a new lawsuit to enjoin such action. In the interests of judicial economy, we think the issues on review can be decided properly only by admitting the additional evidence submitted by respondents. Therefore, since we find the additional evidence submitted by respondents to meet the requirements of RAP 9.11(a), we grant the

motion to allow additional evidence on review.

## II
### Petitioner's Right to Injunctive Relief

■ The granting or withholding of an injunction is addressed to the sound discretion of the trial court to be exercised according to the circumstances of each case. *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 233, 635 P.2d 108 (1981); *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 415–16, 63 P.2d 397 (1936). For purposes of granting or denying injunctive relief, the standard for evaluating the exercise of judicial discretion is whether it is based on untenable grounds, or is manifestly unreasonable, or is arbitrary. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971); *Lenhoff v. Birch Bay Real Estate, Inc.*, 22 Wn. App. 70, 74–75, 587 P.2d 1087 (1978).

■ Preliminary injunctive relief may be available to a party under the circumstances set forth in the injunction statute, RCW 7.40.020. That section provides in part:

> When it appears by the complaint that the plaintiff is entitled to the relief demanded and the relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce great injury to the plaintiff; or when during the litigation, it appears that the defendant is doing, or threatened, or is about to do, or is procuring, or is suffering some act to be done in violation of the plaintiff's rights respecting the subject of the action tending to render the judgment ineffectual; or where such relief, or any part thereof, consists in restraining proceedings upon any final order or judgment, an injunction may be granted to restrain such act or proceedings until the further order of the court . . .

RCW 7.40.020. Our most recent opinion outlining the necessary criteria for injunctive relief under the statute is *Tyler Pipe Indus., Inc. v. Department of Rev.*, 96 Wn.2d 785, 638 P.2d 1213 (1982). In *Tyler Pipe*, we quoted the following criteria from *Port of Seattle v. International Longshoremen's Union*, 52 Wn.2d 317, 319, 324 P.2d 1099

(1958):

> It is an established rule in this jurisdiction that one who seeks relief by temporary or permanent injunction must show (1) that he has a clear legal or equitable right, (2) that he has a well–grounded fear of immediate invasion of that right, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him.

*Tyler Pipe,* at 792. Since all three of these criteria must be satisfied to warrant preliminary injunctive relief, the failure to establish any one or more of the criteria dictates that the requested relief be denied.[5]

## A
### Clear Legal or Equitable Right

In the case of *Isthmian S.S. Co. v. National Marine Eng'rs Beneficial Ass'n,* 41 Wn.2d 106, 117, 247 P.2d 549 (1952), this court emphasized the necessity of establishing a clear legal or equitable right and held that an injunction "will not issue in a doubtful case". In *Tyler Pipe,* we determined that to answer the question of whether a party has a clear right, we must analyze the moving party's likelihood of prevailing on the merits. Of course, in making this determination, we do not adjudicate the ultimate rights of the parties in the lawsuit. *Tyler Pipe,* at 793.

The trial court judge, in his order of September 1, 1982, specifically found that respondents were likely to prevail on

---

[5]Justice Dore's dissenting opinion relies on *Dore v. Kinnear,* 79 Wn.2d 755, 489 P.2d 898 (1971) as authority for the issuance of a preliminary injunction until a trial could be conducted to resolve the merits of this case. Unfortunately, *Kinnear* provides no support for this proposition. In *Kinnear,* we granted a temporary injunction to preserve the status quo pending a final determination on the merits of appellants' direct appeal from the trial court decision dismissing the action. (The same relief would be available now under RAP 8.3.) The preliminary relief granted in *Kinnear* was intended to assure an effective and equitable appellate review by simply maintaining the existing conditions in a case we had already accepted for review and were about to hear on appeal. Nothing in *Kinnear* or RAP 8.3 supports the granting of preliminary injunctive relief to preserve the status quo in a case not yet accepted for review simply because it has the potential for someday ripening into an appeal. Therefore, cases such as the one now before us must be evaluated in light of the injunction statute, RCW 7.40.020.

the merits. In so doing, he interpreted the two applicable statutes dealing with payment of state employee salaries to give the Director of Financial Management the right to change the date of payment and to implement a lagged payroll system. RCW 42.16.010 provides:

The salaries of all state officers and employees shall be paid monthly on the last day of each month *unless the director of financial management shall establish different dates in accordance with RCW 42.16.017: Provided,* That the director of financial management may adopt or authorize adoption of semimonthly or more frequent payment schedules for state agencies, in his discretion: *And provided further,* That schedules for the payment of compensation more often than semimonthly may be adopted only upon the written requests of state agencies, and only for the purpose of conforming state payment schedules for classes of employees in specific trades or occupations to customary schedules prevailing in private industries.

(Italics ours.) RCW 42.16.017, dealing with payroll preparation and accounting, provides that:

To facilitate payroll preparation and accounting, or to implement the provisions of RCW 42.16.010 through 42.16.017, the director of financial management may adopt customary and necessary procedures *including the establishment of pay dates at reasonable times following periods in which payment is earned.*

(Italics ours.) From the italicized language of the above statutes, it appears fairly certain that the Director of Financial Management can (1) establish a different date of payment of salaries and (2) establish a method of payment at reasonable times following the periods in which salaries are earned. Consequently, there is no absolute right to be paid on the last day of the month. The only real question is whether the proper procedures were followed in establishing a lagged payroll system and whether it was done for the proper reasons.

Since we have previously decided to grant respondents' motion to allow additional evidence on review, we need only refer to those documents to determine whether the

lagged payroll plan was properly adopted. The order of Mr. Taller and the applicable regulations issued by his Office of Financial Management seem to satisfy the procedural requirements of RCW 42.16.017. As for the purposes in switching to a lagged payroll system, we look to the statement of reasons given by Mr. Taller in his order, as well as to the reasons given in the implementation of administrative rules and affidavits filed by members of Mr. Taller's staff. Those documents indicate that a lagged payroll system will be much more effective in reducing payroll and accounting errors and will be less costly to operate than the previous method of payment. These justifications satisfy the statutory requirement of RCW 42.16.017. While the Governor's stated reasons for the lagged payroll are interesting and significant, he was not authorized to implement such a system. Although Mr. Taller may also have had revenue raising in mind, we need not look to the purity of his motives as long as the proper reasons of payroll preparation and accounting efficiency were accomplished.

Finally, in his oral decision the trial judge determined that a triable issue of fact existed as to whether a twice monthly lagged payroll was as efficient or more efficient than a monthly lagged payroll. Although there may be some question as to the relative merits of either system, we believe the separation of powers doctrine prevents the judiciary from examining the wisdom of one method of payment over another as long as the method chosen fulfills the permissible statutory purpose. *See, e.g., State Pub. Employees' Bd. v. Cook,* 88 Wn.2d 200, 206–07, 559 P.2d 991 (1977), *adhered to on rehearing,* 90 Wn.2d 89, 579 P.2d 359 (1978); *Salstrom's Vehicles, Inc. v. Department of Motor Vehicles,* 87 Wn.2d 686, 692–93, 555 P.2d 1361 (1976). We leave such decisions to the Legislature and Governor.

After reviewing the facts and documents, we conclude that petitioner has not made the requisite showing of likelihood of success on the merits. Therefore, we hold petitioner has not established a clear legal or equitable right.

## B
## Well Grounded Fear of Invasion

It appears that both sides agree that if there is a right to be paid at the end of the month or a right to have the lagged payroll implemented in accordance with petitioner's views, there would be a well grounded fear of invasion of this right.

## C
## Actual and Substantial Injury

The record contains a number of affidavits detailing the potential hardships to be suffered by state employees and by programs designed to serve state employees' interests (*e.g.,* retirement funds and pension funds). Petitioner contends there is no remedy at law that would restore the affected state employees to the status quo ante if their homes or cars are repossessed, or if their health insurance and retirement systems are depleted or canceled. This assertion is well nigh irrefutable.

Unfortunately, petitioner fails to set forth proof of such injuries to be suffered by state employees. Nowhere in the record do we find an affidavit on behalf of any state employee who may be injured. Neither can we take judicial notice of such potential hardships because such facts are not of the type that can be judicially noticed under ER 201:[6]

> Judicial notice, of which courts may take cognizance, is composed of facts capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy and verifiable certainty. The court may
> ". . . resort to encyclopedias, authoritative works upon the subject, reports of committees, scientific bodies, and

---

[6]We find it interesting to note that after castigating the majority for engaging in unwarranted factfinding, Justice Stafford's dissent seems to blaze new trails and reach new frontiers in the area of judicial notice regarding the issue of substantial injury to state employees. We are aware of no authority, nor is any cited by Justice Stafford in his dissent, which permits judicial notice of the the *underlying facts* to which he applies his "simple arithmetic and pencil and paper". See dissenting opinion of Stafford, J., at 900–02.

any source of information that is generally considered accurate and reliable . . ."
(Citation omitted.) *State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 779, 380 P.2d 735 (1963). In short, after reviewing the facts and evidence available to us, we must conclude petitioner has failed to prove an actual and substantial harm in its request for an injunction.[7]

After applying the criteria of *Tyler Pipe* to the facts of this case, we must conclude petitioner WFSE has failed to establish the prerequisites for injunctive relief. Therefore, the trial judge did not abuse his discretion in denying such relief. Under these circumstances, the preliminary injunctive relief ordered under RAP 8.3 was dissolved.

UTTER, DOLLIVER, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

STAFFORD, J. (dissenting)—In an obvious attempt to uphold the decision of the trial court denying the preliminary injunction, the majority has improvidently crossed the line which separates an appellate court of review from a factfinding body. This is a dangerous precedent and for that reason, I must dissent.

---

[7]Justice Stafford contends in his dissenting opinion at pages 900–01, that the simple use of paper and pencil would disclose the lagged payroll system will adversely affect state employees' federal income tax liabilities and their eligibility for full state retirement benefits. As for the tax effect calculations, reference to the Internal Revenue Code would disclose that 1982 tax liability actually would be *decreased* because there would be less taxable income in that year and one would find 1983 tax rates will be *lower* than in 1982, both factors the dissent neglects to mention. As for Justice Stafford's contention that state employees would be penalized for retiring in the 2–year period following implementation of the lagged payroll system, the plain language of the applicable statute, RCW 41.40-.010(15)(a), reveals Justice Stafford's interpretation is patently incorrect. The statute refers to the "annual average of the greatest compensation *earnable* by a [retirement system] member during any consecutive two year period of service for which service credit is allowed; . . ." (Italics ours.) RCW 41.40.010(15)(a). The word "earnable" includes at least that which has been earned by the individual on the day of retirement, whether or not it actually has been paid. Thus, retirement at the end of a month under the new lagged payroll plan will have no adverse impact on a state employee's eligibility for full retirement benefits.

## I
### FACTUAL BACKGROUND

While I agree with most of the factual background related by the majority, I feel much relevant information has been omitted.

The present controversy arose on July 16, 1982, when the Governor notified all state employees that effective August 31, 1982, the State would implement a new "lagged payroll" method of compensation. Under this new plan, the compensation owed to an employee and statutorily paid by the State at the end of the month would be "lagged" 10 days. To make the shift to the new plan in August of 1982, the Governor informed the employees that on August 31, 1982, they would receive only 80 percent of their earned compensation and would receive the balance on September 10. The employees were further informed, "*For September 1982, and after,* you will receive 100 percent of your pay . . . on the 10th day or second Friday, whichever occurs first, following the last of the preceding month". The Governor's letter gave as his reason for adopting the "lagged payroll" plan the fact that it would "yield $4 million for the remainder of this biennium".

On the same date the Governor sent a similar letter to numerous financial institutions informing them that a "lagged payroll" plan was to be adopted in August 1982 to make the state operate more like a private business "and at the same time yield $4 million for the remainder of the fiscal year 1983—$4 million that will in fact reduce the remaining $20 million budget deficit . . ." Thus, as things stood on July 16, 1982, the Governor had announced the adoption of a "lagged payroll" plan to be effective August 31, 1982. His announced reason for adopting the plan was to save $4 million and thus reduce a large budget deficit.

At this juncture it is important to note that while the Governor's intentions may have been laudable, the "lagged payroll" system initiated by him was without authority of law. RCW 42.16.010 provides clearly that "The salaries of all state officers and employees shall be paid monthly on

the last day of each month unless the *director of financial management* shall establish different dates in accordance with RCW 42.16.017". (Italics mine.) Thus, *only the director of financial management had authority* to establish a different date. Consequently, the Governor improperly usurped that authority. Further, RCW 42.16.017[8] provides that even the *director of financial management* has power to change the statutory dates only "[t]o facilitate payroll preparation and accounting" and certain other matters not here important. Yet, the Governor's declared reason for acting was to raise additional revenue as an aid in meeting the budget deficit. Clearly this was not authorized by statute.

On July 16, 1982, following the Governor's unauthorized adoption of the lagged payroll plan, for reasons not authorized by statute, petitioner Washington Federation of State Employees (WFSE) commenced the instant action. Petitioner WFSE asked that the lagged payroll system be declared unlawful and unconstitutional. Petitioner further requested preliminary injunctive relief under RCW 7.40.020 to preserve the existing method of payment of state employees' salaries until the trial court could consider and determine the legal and factual issues involved.

On August 9, 1982, the trial court rejected petitioner's constitutional challenge and thereafter considered the legality of the lagged payroll system adopted by the Governor and due to take effect August 31, 1982. After a continuance to August 20, 1982, the trial court held the lagged payroll system was authorized by RCW 42.16.010 and .017. This result was reached despite the fact that the Governor clearly had no statutory authority to have proceeded as he did. The trial court held that although the Governor's letter contemplated implementation of the lagged payroll plan for

---

[8]RCW 42.16.017. "Payroll preparation and accounting—Establishment of pay dates. To facilitate payroll preparation and accounting, or to implement the provisions of RCW 42.16.010 through 42.16.017, the director of financial management may adopt customary and necessary procedures including the establishment of pay dates at reasonable times following periods in which payment is earned."

an unauthorized purpose (*i.e.*, to raise additional revenue) it had the required effect of facilitating payroll and accounting efficiencies. This holding wholly overlooked the fact that the director of financial management had the exclusive power to so act and at that time had taken no such action.

Having determined that the lagged payroll plan was implemented in accordance with statutory requirements, the trial court found that WFSE was not likely to prevail in a later trial on the unresolved factual issues. The trial court therefore refused to grant the preliminary injunction requested by WFSE to preserve the status quo until the remaining factual issues could be resolved. In denying the injunction, while ignoring the glaring statutory deficiencies of the lagged payroll plan, the trial court abused its discretion. The majority herein has erred in failing to find such abuse of discretion.

## II
### MOTION FOR RECEIPT OF ADDITIONAL EVIDENCE ON REVIEW

Petitioner WFSE filed a motion for discretionary review in this court August 23, 1982, and on August 24, 1982, then Chief Justice Brachtenbach heard oral argument on petitioner's motion for discretionary review and request for preliminary injunctive relief. On that date the Chief Justice properly granted the motion for discretionary review and, pursuant to RAP 8.3, preserved the fruits of the appeal by enjoining implementation of the proposed lagged payroll plan until there could be review by the en banc court.

At the time of the hearing before the Chief Justice, the facts and the total failure to comply with RCW 42.16.010 and .017 were as related above. It was the Chief Justice who brought the statutory deficiencies to the attention of all parties. The lagged payroll plan had been implemented by the wrong person for the wrong reasons. Clearly the trial court had committed error by holding to the contrary.

This was the state of the record at the time the issues

were submitted to the en banc court for review on September 7, 1982.

Two days after the Chief Justice disclosed the serious statutory flaws, the State began an "after–the–fact" attempt to rectify the problem. On August 26, 1982, the director of financial management, the one properly authorized to act under RCW 42.16.010 and .017, finally issued a directive initiating the lagged payroll plan, stating that payroll and accounting efficiencies would be gained thereby. While it is possible this may have belatedly brought the State's efforts into compliance with RCW 42.16.010 and .017, it also completely changed the nature of the case that had been considered by the trial court and the Chief Justice.

At this juncture the State moved to have the late changes considered by the en banc court in its review of both the trial court's ruling and the action of the Chief Justice. Without question, RAP 9.11(a) authorizes this court to direct that additional evidence be taken before the decision of a case on review; however, RAP 9.11(a) permits the receiving of such new evidence *only if* six conditions are met. It is of importance to note the majority conceded the six conditions *were not met*. This would normally have prevented granting the State's motion. Nevertheless, the majority, after conceding noncompliance with RAP 9.11(a), admittedly "alter[ed] the provisions of the rule in this case to consider respondents' motion in light of the other six requirements of RAP 9.11(a)." Majority opinion, at 885. *Even then,* however, the normal procedure under RAP 9.11(b) would have required a remand to the trial court for its consideration of the new evidence.

While I do not deny our rules should be interpreted to promote justice and facilitate the decision of cases on the merits, RAP 1.2, 18.8, the instant subjective result–oriented change causes me great concern. If, as the majority contends, consideration of the State's changed position was "necessary to fairly resolve the issues on review" the matter should at least have been remanded to the trial court under

RAP 9.11(b). We are an appellate court of review; we are not a factfinding court. Moreover, the issues being "reviewed" by this court, after the majority's gratuitous amendment of RAP 9.11(a), are not the same as those faced by the trial court being reviewed.

Under the guise of promoting justice and facilitating decisions, the majority has considered matters injected by the State 6 days after the trial court's ruling and 2 days subsequent to the Chief Justice's action. By so doing, the majority set itself up to review issues totally different from those before the trial court and the Chief Justice. Yet, the majority proceeded on the comfortably false assumption that "we treat this matter as an appeal in the nature of a motion to modify his preliminary ruling. *See* RAP 17.7." Majority opinion, at 883.

Granted, this court can grant relief to insure effective and equitable review. RAP 1.2. Without question the court can hear motions to modify rulings pursuant to RAP 17.7. In the granting and reviewing of such motions, however, this court must exercise some judicial restraint to insure that it will actually be performing some function of review. Here, the majority performed no function of review. It not only failed to give the trial court an opportunity to rule on the newly admitted evidence, but also heard and passed upon totally new and different issues, a function not usually usurped by the Supreme Court. Normally, we have followed the proper course of reviewing only those matters actually before the court being reviewed. We have, in fact, refused to consider matters raised for the first time on review. *State v. Davis*, 41 Wn.2d 535, 250 P.2d 548 (1952). This is but a matter of common sense and orderly appellate procedure.

I do not assert that this court lacked the raw power to proceed as it did. I am concerned, however, with the wisdom of the maneuver, particularly since it would have required only a short delay to permit the remaining factual issues to be heard on their merits by the trial court. If the lagged payroll change was truly made to accomplish the

payroll and accounting efficiencies authorized by RCW 42.16.017, as belatedly claimed by the State, the act of maintaining the status quo for a few more days would not have been disruptive. If, however, the lagged payroll system was actually adopted to accumulate interest for the state treasury, as originally claimed by the Governor, the short delay would only have put off an illegal procedure. Thus, the nebulous "emergency" upon which the majority relied simply did not exist. In either possible event, the action by the majority was unnecessarily precipitous and improperly taken.

## III
### INJUNCTIVE RELIEF

I agree with the majority that the granting or withholding of injunctive relief is addressed to the sound discretion of the trial court. *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 233, 635 P.2d 108 (1981). I also agree that RCW 7.40.020 governs the granting of injunctions and that one seeking relief by temporary or permanent injunction must show (1) that he has a clear legal or equitable right, (2) that he has a well grounded fear of immediate invasion of that right, and (3) that the acts complained of will result in substantial injury to him. *Tyler Pipe Indus., Inc. v. Department of Rev.,* 96 Wn.2d 785, 638 P.2d 1213 (1982). Unlike the majority, however, I would find the trial court abused its discretion in finding that WFSE failed to meet its burden.

### A
### Clear Legal or Equitable Right

In *Tyler Pipe,* at 793, we held that to determine whether a party has a clear right we must analyze the movant's likelihood of prevailing on the merits. The trial court specifically held that petitioner WFSE was not likely to prevail on the merits. In so holding the trial court committed clear error.

As indicated above, RCW 42.16.010 and .017 govern the timing of state employee salary payments, the authority to

change the statutory pay schedule and the reasons for which changes may be made. The majority agrees the statutes give the director of financial management the exclusive power to change the payment dates for the purpose of facilitating payroll preparation and accounting. Thus, it is said, "[t]he only real question is whether the proper procedures were followed in establishing a lagged payroll system and whether it was done for the proper reasons". Majority opinion, at 889.

As indicated earlier, the Governor, acting without authority, implemented the plan for unauthorized budgeting purposes. Consequently, at the time the matter was heard by the trial court and the Chief Justice, the action violated a clear statutory right of state employees. While the State made a belated attempt to correct the error, this late act was not before the trial court or the Chief Justice for consideration. Thus, clearly the trial court committed error by concluding the petitioner WFSE could not prevail on the merits. It was only after the majority herein agreed to consider the State's documents, thus changing its position, that there was even a real issue to consider.

As indicated earlier the majority's action was incorrect. Thus, when properly considered, the employees did have an invasion of a clear legal right at the time the issue was presented to the trial court and reviewed by the Chief Justice. That right continued until the majority inappropriately changed the rules in the middle of the contest. Without this additional evidence, it is apparent the trial court erred in finding no legal right was invaded.

### B
### Well Grounded Fear of Invasion

The majority has concluded that the state employees had a well grounded fear their rights were about to be invaded. Thus, it is unnecessary to discuss the issue further.

### C
### Substantial Injury

The majority acknowledges the existence of numerous

"affidavits detailing the potential hardships to be suffered by state employees and by programs designed to serve state employees' interests (*e.g.,* retirement funds and pension funds)." Majority opinion, at 891. The majority admits "there is no remedy at law that would restore the affected state employees to the status quo ante if their homes or cars are repossessed, or if their health insurance and retirement systems are depleted or canceled." Majority opinion, at 891. These contentions are rejected, however, because the majority is not satisfied that any specific state employee has asserted such potential injury.

Apparently, the majority feels it should not act until there is actual proof that disaster has struck. Unfortunately, as admitted by the majority, there then would be "no remedy at law that [c]ould restore the affected state employees to the status quo ante . . ." Majority opinion, at 891. This makes no sense to me, particularly when only a very short delay in implementation of the lagged payroll plan was requested to permit a hearing on the merits.

Additionally, the majority contends it is unable to take judicial notice of the potential hardships. I would suggest the affidavits plus the use of a pencil and some paper would have revealed the hardships most graphically. For example, it takes little imagination to determine that as a result of the lagged payroll plan the state employees would be paid in 1982 for 11 and not 12 months of work. The use of pencil and paper would also have disclosed that the Internal Revenue Service "withholding" for 1982 would thus be considerably less. This alone would create quite an impact on employees who relied on a specific estimated amount for paying their annual income tax. In addition, by making the December payment in January 1983, the employees' salary would be subject to an OASI (FICA) installment that would not have been imposed had the salary been paid in December 1982. This is no small matter to many employees who were relying on a full December paycheck. It does the employee little good to say "it will all come out in the wash some time in the next few years."

Again, the simple use of pencil and paper would have disclosed that employees considering retirement will be severely affected by adoption of the lagged payroll system. The base for retirement is the employee's highest average final compensation received over 24 consecutive months. *See* RCW 41.40.010(15)(a). This is usually the last 2 years of employment because normally payment in these months would be the highest. Under the lagged payroll system, however, employees will be paid for only 11 months in 1982; therefore, anyone seeking retirement in the next 2 years will be credited for only 23 months in the 24–month period. Simple arithmetic reveals a serious impact on potential retirees. This is also disclosed in affidavit form.

Turning from the impact the lagged payroll system would have on IRS withholding, OASI withholding and retirement, it is again clear that much can be learned by the simple use of pencil and paper. There is no need to turn to technical rules of judicial notice and affidavits.

It is obvious that in the real world banks, credit unions, stores with charge accounts and creditors who issue credit cards (*e.g.*, VISA, Master Charge, American Express, Diner's Club and gasoline companies to name a few) all assess a fee for late payment. While it would require affidavits to determine the actual percentage points used by the various companies, it is clearly common knowledge that the system is operative and that it applies to any person who makes a late payment. It is unrealistic to conclude that a 10–day delay in payments will not cause many employees to incur such "late charges". In fact, the State concedes that the lagged payroll system will "require alignment of personal budgeting and spending patterns to accommodate payments normally made on the first of the month . . ." Clerk's Papers, at 95.

Finally, the lagged payroll system, as applied to salaries paid prior to January 1, 1983, raises a problem of constitutional dimensions albeit affecting only a small number of the total state personnel. Const. art. 3, § 25 and Const. art. 28, § 1 as amended by Const. art. 30, § 1 provide that com-

pensation for state officers must not be diminished during their terms of office. During 1982 the state officers were paid 11 months' compensation for 12 months' work. This is reflected in their IRS W–2 forms, their OASI withholding and their IRS withholding. Surely the majority could have considered this either by way of judicial notice or simple common knowledge.

Based on all of the foregoing it is clear petitioner WFSE established substantial harm in its request for a preliminary injunction pending a full hearing by the trial court on the merits.

After applying the criteria of *Tyler Pipe* to the facts established both by affidavit and common knowledge, I can only conclude WFSE has established the prerequisites for preliminary injunctive relief. In light of the record before the trial court, I am compelled to find an abuse of discretion by the trial court in failing to grant the preliminary injunction. The majority compounded the problem by improperly admitting evidence ex post facto to justify the trial court's erroneous decision. I would reverse the trial court and remand with instruction to enter a preliminary injunction pursuant to RCW 7.40.020.

ROSELLINI, J., concurs with STAFFORD, J.

DORE, J. (dissenting)—I concur in much of Justice Stafford's dissent, and add the analysis set forth below.

On August 24, 1982, the Chief Justice signed an injunction order on the "pay lag" executive order saying at page 1

> the respondents are enjoined from implementing their announced plans to delay payment of salaries of state employees and officers, described in the pleadings as the lagged payroll plan.

The order also provided that the injunction should remain in effect until further order of this court.

After the State moved for reconsideration, the majority of this court dissolved the Chief's injunction on September 8, 1982, saying in its order at page 1

In light of the importance of the issues and the necessity for a speedy decision so as to minimize any consequential loss to either or both parties, this matter is remanded to the Thurston County Superior Court with directions that the trial be held within 30 days of this order.

The State argued that the request for the injunction claiming irreparable harm brought about by missed house and car payments and attendant penalties for late payments was too generalized and not documented by individual affidavits of State employees. The State also stressed that the trial judge had found the Washington Federation of State Employees (WFSE) would, in all probability, not prevail on the merits.

These same arguments were made to this court in the case of *Dore v. Kinnear*, 79 Wn.2d 755, 489 P.2d 898 (1971). In that case, 27,000 taxpayers requested a preliminary injunction enjoining the State and County from using new appraisals two or three times the existing valuations for real estate tax purposes. General affidavits signed by the taxpayers' attorney were filed claiming such taxes would be confiscatory and that hundreds of taxpayers might lose their homes. This court did not request or require individual affidavits from such property owners to illustrate their potential damages, but reasoned that if 27,000 property owners had their property assessed at two or three times present valuation, taxes would be increased two or three times, and that any average person would conclude that such taxpayers would be irreparably harmed.

The taxpayers' action in *Kinnear* had been dismissed with prejudice at the superior court level, whereas the trial judge here merely found that it was unlikely that the WFSE would prevail on the merits.

The Supreme Court, in *Kinnear,* in an effort to protect the taxpayers within their inherent equity powers, enjoined the collection of $6.6 million in taxes, even though the injunction had been requested on a case that already had been tried on the merits in the trial court and lost.

The subject record shows that a great number of the

more than 60,000 state employees would probably be substantially damaged by the Governor's order which plucked 1 month's salary out of each state employee's pocket for the initial year. There was no need for each of them to sign individual affidavits to show irreparable damages. We surely could take judicial notice that state employees on tight budgets would be irreparably damaged if they lost their cars, homes and other essentials by being unable to meet their contracted obligations on the first of the month.

I am persuaded by the reasoning of this court in *Dore v. Kinnear* which, in granting a temporary injunction dated March 29, 1971, stated:

■It appearing from affidavits, briefs, records presented, and oral argument that the increased assessed values determined in 1970 for taxes due and payable in 1971, as established by the revaluation program then conducted in King County by the Jacobs Company, Inc., and embracing only some 27,000 taxable units out of a total of 450,000 taxable units within such county, may present significant issues of constitutional and statutory law; and

■WHEREAS, pending resolution of these issues, the proper amount of taxes due and payable by taxpayers affected by said revaluation program remains uncertain; and

■WHEREAS, the Court *has inherent authority to exercise its equity powers by temporary injunction to preserve the status quo pending a final determination on the merits,* and a majority of the members of the Court having, after full consideration, determined that such a temporary injunction is appropriate under the particular circumstances of this case, and should issue; Now, Therefore,

■IT IS HEREBY ORDERED that, conditioned on appellants filing in this Court a bond in the amount of $500 to pay damages and costs which may accrue to the respondents by reason of this order, respondents are temporarily enjoined during the pendency of this appeal from requiring, as a condition of acceptance, increases in the amount of property taxes due to the said revaluation conducted by Jacobs Company, Inc.

(Italics mine.)

In the subject case, the State produced affidavits that after the injunction was dissolved, the pay lag bill couldn't be implemented until the first of the next month or October 1, 1982. As the court provided that the trial should be commenced no later than October 9, 1982, no irreparable harm would have been suffered by the State from a continuance of the injunction for another *9 days* and/or until the trial on the merits could be determined.

Based on our holding and rationale of the court in *Dore v. Kinnear* in granting a temporary injunction to taxpayers on a case lost at the superior court level, and our inherent authority to exercise equity powers in the interests of justice, I agree with Justice Stafford that the temporary injunction should have been continued until the trial on the merits, which was ordered to be commenced within 30 days after September 9, 1982.