IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

WHITE WATER INVESTMENT, LLC, a )    No. 71115-6-I
Washington Limited Liability Company, )
     )
         Appellant, )
     )
       v. )    UNPUBLISHED OPINION
     )
COOL BEANS EASTLAKE, LLC, a )
Washington Limited Liability Company, )
     )
         Respondent. )    FILED: March 23, 2015

SCHINDLER, J. — Cool Beans Eastlake LLC and White Water Investment LLC

own adjacent parcels of property. In 2003, the previous owners entered into a

"Reciprocal Easement Agreement" (REA). In 2004, Cool Beans' predecessor in interest

constructed a building in violation of the REA. In July 2012, White Water filed a lawsuit

against Cool Beans to enforce the REA and remove the building. Because the court did

not abuse its discretion in refusing to grant injunctive relief, we affirm.

Reciprocal Easement Agreement

In 2002, Andrew J. Barber and Barber Development LLC (Barber) purchased two

parcels of property located on Eastlake Avenue East for $1.2 million. "Parcel I" was

undeveloped and a "mini mart" was located on "Parcel II."

In 2003, Castellum LLC and William and Annie Kim (collectively Castellum) purchased Parcel II and the mini mart. Barber retained ownership of Parcel I. Barber planned to build a 1,600-square-foot building on Parcel I subject to an easement with Castellum to provide shared parking and access to Eastlake Avenue East.

Barber and Castellum entered into a "Reciprocal Easement Agreement" (REA) on June 16, 2003.[1] The REA grants nonexclusive, mutual access rights. The REA designates "Common Areas" for use as "roadways, walkways, ingress and egress, and parking," and "Building Areas." The stated "primary purpose" of the REA is to provide parking for "customers, invitees and employees," and "for the servicing and supplying of such businesses" located on the property. Castellum acknowledges construction of a 1,600-square-foot retail building on Parcel I would "utiliz[e] a portion of the parking areas and Common Areas." The REA states that the building would not be constructed "on Parcels I or II except within the Building Areas." The REA also restricts the ability to change the "size and arrangement of the Common Areas . . . except by mutual agreement in writing."

The REA provides, in pertinent part:

> 7.    The parties hereto do hereby establish and create for the benefit of the Building Areas and for the benefit of the various owners, lessees and/or occupants of the Shopping Center, their employees, customers, and invitees, a mutual reciprocal and nonexclusive easement, right and privilege to use the Common Areas for roadways, walkways, ingress and egress, and parking of motor vehicles. . . . All of the uses permitted within the Common Areas shall be used with reason and judgment so as not to interfere with the primary purpose of the Common Areas, which is to provide for parking for the customers, invitees and employees of those businesses conducted within the Building Areas and for the servicing and supplying of such businesses.
> 8.    No building shall be constructed on Parcels I or II except within the Building Areas. . . . Parcel II Owner acknowledges that a

---

[1] The REA was recorded on June 18, 2003.

2

material consideration in Parcel I Owners' acquisition of Parcel I and execution of this Agreement is its ability to construct a building with a footprint of approximately 1,600 square feet on Parcel I, and Parcel II Owner further acknowledges that said building may not be constructed on Parcel I without utilizing a portion of the parking areas and Common Areas of Parcel II. . . .

9. The size and arrangement of the Common Areas shall not be changed, except by mutual agreement in writing by the owners of the Shopping Center.

Attached to the REA as "Exhibit A" is a "Preliminary Site Plan" that shows the location of the existing "mini mart" on Parcel II and the proposed 1,600-square-foot retail building on Parcel I. The proposed 1,600-square-foot retail building is 50 feet long by 32 feet wide with eighteen parking spaces and a 20-foot drive aisle along the boundary between Parcel I and Parcel II. Eleven of the parking spaces are located on either side of the 20-foot drive aisle—six parking spaces on Parcel II and five parking spaces on Parcel I. The site plan also shows a 24-foot drive aisle and seven parking spaces located next to and directly east of the proposed new retail building on Parcel I.

Construction of Starbucks Building

Barber contacted Starbucks about leasing the new retail building. Starbucks agreed to enter into a lease of the new building after construction. In early 2004, Barber gave Castellum a copy of a revised site plan for the Starbucks building. The revised site plan shows a 1,600-square-foot building that is narrower and longer than the proposed building shown on the previous site plan. The revised site plan also eliminates the 24-foot drive aisle on the east side of the building on Parcel I and reconfigures the 18 parking spaces.

On February 11, 2004, Castellum's attorney sent a letter to Barber addressing the revised site plan. The letter notes that "the positioning of the Starbucks and the

arrangement of the parties' common areas" in the revised site plan "has changed substantially from that agreed to" in the REA. The letter states that "Castellum will refrain from objecting to the new configuration at this time" but points out that "development of a residence on the Castellum parcel will affect the eastern most parking spot." The letter also notes that the new site plan "indicates for the first time that the Starbucks' dumpster will be located on Castellum's property." The letter states Castellum "reserves its right . . . to withhold consent to the changes" until the parties resolved these issues.[2]

On March 17, 2004, Barber entered into a contract to construct a building on Parcel I as depicted in the revised site plan. Construction was completed in 2004.

Sometime in 2005 or 2006, Barber sought to amend the REA. In March 2006, Barber sent Castellum an "Amended and Restated Reciprocal Easement Agreement." Castellum did not agree to enter into the amended easement agreement.

On July 13, 2006, Castellum's attorney sent a letter to Barber about "two areas of controversy." The letter states that "the reciprocal arrangement regarding parking continues to raise difficulties for these operators of the Quick Stop Deli." Specifically, that Starbucks' employees and customers "utilize the majority of the parking" and

---

[2] The letter states, in pertinent part:

Castellum recently received a copy of Barber Development LLC's new site plan for the development of the Starbucks on its parcel on Eastlake Avenue in Seattle. Castellum notes that the positioning of the Starbucks and the arrangement of the parties' common areas has changed substantially from that agreed to in the Reciprocal Easement Agreement (the "Agreement").

While Castellum will refrain from objecting to the new configuration at this time, it would like to point out that, pursuant to Paragraph 8 of the Agreement, development of a residence on the Castellum parcel will affect the eastern most parking spot located there. The new site plan also indicates for the first time that the Starbucks' dumpster will be located on Castellum's property. . . . Because of these outstanding items, Castellum reserves its right under Paragraph 9 of the Agreement to withhold consent to the changes in the site plan until the parties[ ] have reached an understanding as to these issues.

4

Starbucks' delivery trucks occupy the drive aisle, "making any ingress and egress essentially impossible." The letter refers to "discussions about putting signage in place limiting parking to no more than fifteen minutes." The letter also states that "Starbucks is violating both the spirit and intent of [the] language in [paragraph 15 of the REA] by Starbucks' sale of deli sandwiches."

Cool Beans Purchases Parcel I

In August 2006, Barber sold Parcel I to Cool Beans Eastlake LLC. In negotiating the purchase and sale agreement, Cool Beans asked Barber about parking issues with Castellum and the parking easement. An e-mail from Cool Beans to Barber states, in pertinent part:

> 3. Lessee Parking. Please provide me with an explanation of where Starbucks' employees park and describe progress in resolving . . . Kim's parking issues. . . .
>
> 4. Cross-Parking Easement. Please obtain Seller's explanation for the purpose or benefits of the "Amended" Parking Agreement and whether it is worth my pursuing given Kim's state of mind on the subject.

Barber responded that he tried unsuccessfully to negotiate an amended REA with Castellum "to clarify the parking issues" and "to correct the site plan." Barber states the Starbucks employees "park on the street" and that "in the last six months," there were "no discussions" and "no progress."

White Water Purchases Parcel II

In March 2012, Castellum sold Parcel II to White Water Investment LLC. After White Water "received information about the value of the property and affiliated easement," it reduced the purchase offer from $1.2 million to $1 million. The February

22, 2012 e-mail from White Water's attorney to Castellum's real estate broker describes

the reasons "that warrant[ed] a lower purchase price:"

> 1. There is a substantial risk that the 2003 easement could prevent the Buyer from expanding the existing building footprint. When negotiations began, the Buyer anticipated use of the entire property.
>
> 2. Starbucks' customers frequently monopolize all parking spots located on the adjoining parcels. Insufficient parking will be detrimental to the Buyer's anticipated business.
>
> 3. Resolving the easement and parking issues with the adjoining landowner will require expensive legal services on a short time frame in light of [Washington]'s ten-year statute of limitations for real property disputes.
>
> 4. The building can not [sic] be used "as-is" for a restaurant. Asbestos, lead-based paint, foundation concerns, leaks, and a failing roof will all need to be remediated. Given the costly remodel that will be required, the value of the existing structure (if any) should not be incorporated into the purchase price. To the contrary, demolition and remodel costs should be deducted from the value of the land.

The attorney for White Water requested language in an addendum to the

purchase and sales agreement "regarding the easement that may be useful in future

negotiations with the adjoining landowner." The "Addendum/Amendment to Purchase

and Sale Agreement" states, in pertinent part:

> RECIPROCAL EASEMENT AGREEMENT. Buyer acknowledges receipt of the Reciprocal Easement Agreement, recorded in King County on June 18, 2003 as instrument No. 20030618003138. Seller represents and warrants to Buyer that (a) at no time has Seller agreed to let the adjoining property owner violate the Reciprocal Easement Agreement or waived Seller's right to enforce the Reciprocal Easement Agreement and (b) at no time has Seller received compensation of any sort relating to a violation or alleged violation of the Reciprocal Easement Agreement.

White Water Lawsuit

On July 10, 2012, White Water filed a lawsuit against Cool Beans for trespass

and breach of easement agreement. White Water requested damages, injunctive relief,

and "an order quieting title in the Easement Agreement in accordance with its express terms or an order amending the Easement Agreement as acceptable to White Water."

In April 2013, White Water filed a motion for partial summary judgment, arguing the undisputed facts established construction of the building on Parcel I violated the REA. White Water asked the court to enforce the express terms of the REA and compel removal of the Starbucks building. The court granted White Water's motion "in part" on the grounds that "the Easement agreement is unambiguous and the 2004 construction violated the Reciprocal Easement Agreement."

On August 8, Cool Beans filed an amended answer asserting a number of affirmative defenses, including statute of limitations, laches, and balancing the equities.

Cool Beans filed a motion for summary judgment, arguing the trespass claim was barred by the three-year statute of limitations for torts[3] and the claim for breach of the REA was barred by the six-year statute of limitations for contracts.[4] Cool Beans also argued that the court should deny the request for an order compelling removal of the Starbucks building.

White Water filed a cross motion for summary judgment, arguing that under RCW 4.16.020, the ten-year statute of limitations "[f]or actions for the recovery of real

---

[3] RCW 4.16.080 provides, in pertinent part, "The following actions shall be commenced within three years: (1) An action for waste or trespass upon real property."

[4] RCW 4.16.040 provides, in pertinent part, "The following actions shall be commenced within six years: (1) An action upon a contract in writing, or liability express or implied arising out of a written agreement, except as provided for in RCW 64.04.007(2)."

property" applied.[5] White Water also argued that Cool Beans could not invoke the equitable defense of balancing the equities because it purchased Parcel I with knowledge that the Starbucks building violated the REA. White Water asked the court to enforce the REA and order Cool Beans to tear down the Starbucks building and restore the 24-foot drive aisle located on Parcel I, or to modify the REA to "excuse[ ]" White Water from complying with building restrictions.

At the beginning of the summary judgment hearing, White Water conceded the three-year statute of limitations barred the trespass claim. The court ruled that because "[t]here is no claim of title" and not "anything possessory about the easement claimed here," the six-year statute of limitations for a contract action, not the ten-year statute of limitations for the recovery of real property, applied. But the court ruled that even if the ten-year statute of limitations applied, it would not require removal of the Starbucks building.

> Even if I didn't read this case as being governed by the six-year statute for the law, which I do, I would still say that I have to turn to equity when I look at claims other than claims for damages such as the judgment, I mean, tearing down Cool Beans's building, which is the remedy being sought here.

The court rejected the argument that Cool Beans was not entitled to invoke the doctrine of balancing the equities. The court considered "the documented benefit to the plaintiff in reduction of [the] purchase price" and concluded that ordering removal of the Starbucks building "would result in overly harsh results" to Cool Beans. The court ruled,

---

[5] RCW 4.16.020 provides, in pertinent part:
The period prescribed for the commencement of actions shall be as follows:
Within ten years:
(1) For actions for the recovery of real property, or for the recovery of the possession thereof; and no action shall be maintained for such recovery unless it appears that the plaintiff, his or her ancestor, predecessor or grantor was seized or possessed of the premises in question within ten years before the commencement of the action.

"The difference between the harm to tearing down a building and the harm to putting up with a different or eliminated drive area and reconfigured parking spaces pales in comparison." The court granted Cool Beans' motion for summary judgment dismissal of the lawsuit.

Injunctive Relief

White Water contends the court erred in ruling the ten-year statute of limitations for the recovery of real property did not apply to the claim for breach of the REA. White Water also asserts the court erred in balancing the equities and denying injunctive relief.[6] Assuming, without deciding, that the ten-year statute of limitations for the recovery of real property applies to the claim for breach of the REA, we address whether the court erred in balancing the equities and refusing to grant injunctive relief.

A quiet title action is an equitable proceeding designed to resolve competing claims of ownership. RCW 7.28.010; Kobza v. Tripp, 105 Wn. App. 90, 95, 18 P.3d 621 (2001). The goal of a court acting in equity is to do substantial justice and end litigation. Carbon v. Spokane Closing & Escrow, Inc., 135 Wn. App. 870, 878-79, 147 P.3d 605 (2006). A trial court has broad discretion to achieve these goals. In re Proceedings of King County for the Foreclosure of Liens for Delinquent Real Prop. Taxes for the Years 1985 through 1988, 123 Wn.2d 197, 204, 867 P.2d 605 (1994).

We review the decision to grant or deny an injunction for abuse of discretion. Wash. Fed'n of State Emps. v. State, 99 Wn.2d 878, 887, 665 P.2d 1337 (1983). A court abuses its discretion if it is exercised on untenable grounds or for untenable reasons. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

---

[6] The court declined to apply laches, stating that Cool Beans failed to demonstrate "damage to defendant resulting from the delay in bringing the action."

9

In considering whether to grant injunctive relief "requiring the removal of an erected building or structure," the court "may balance the equities of the parties" and weigh factors "such as the character of the interest to be protected and the relative hardship likely to result" if an injunction is granted or denied. Green v. Normandy Park Riviera Section Cmty. Club, Inc., 137 Wn. App. 665, 698, 151 P.3d 1038 (2007). The doctrine of balancing the equities is reserved for an innocent party who proceeds with construction "without knowledge or warning that his structure encroaches upon another's property or property rights." Bach v. Sarich, 74 Wn.2d 575, 582, 445 P.2d 648 (1968).

White Water contends Cool Beans is not an innocent party because it purchased the property with knowledge that the footprint of the Starbucks building violated the terms of the REA. Below, the court considered and rejected the same argument. The court concluded neither the case law White Water relied on nor the record precluded Cool Beans from relying on the doctrine of balancing the equities. The court ruled, in pertinent part:

> [The REA] was abandoned almost immediately by one of the parties, Barber, in 2004 . . . .
>
> . . . .
>
> [I]n August of 2006, Barber sold Parcel 1 to Cool Beans, which I know took quick notice of the differing configuration of the property to the REA . . . .
>
> . . . .
>
> Now, plaintiff has argued to me that defendant with knowledge of the REA took a calculated risk that enforcement action would not be pursued.
> But the cases they cite to me are cases where the very property owner who is proceeding in defiance of likely action for long-standing use by another gives the party that seeks the benefit of balancing of the equities.
> In this case, although the defendant took their property with knowledge of the difference between the REA and the footprint here, they

did not have any part in creating that situation. They weren't responsible for that situation. And disproportionality of harm to the defendant is a little overwhelming to the Court in this case.

We conclude the court did not abuse its discretion in deciding that because Cool Beans "did not have any part in" violating the REA by constructing the Starbucks building outside the designated Building Areas, Cool Beans could assert the doctrine of balancing the equities.

None of the cases White Water cites involve a subsequent purchaser who was not responsible for constructing the encroaching structure. See Bach, 74 Wn.2d at 581-82 (the defendants had no right to construct an apartment building over a lake but "knowingly took a risk by continuing construction" despite the protests of neighbors); Green, 137 Wn. App. at 699 (the defendants "took a calculated risk by proceeding with construction" despite clear warning before construction began that they were required to comply with specific setbacks and submit plans for approval); Peterson v. Koester, 122 Wn. App. 351, 360, 92 P.3d 780 (2004) (the defendants "defied the consent to construction covenant and began building before submitting plans"); Radach v. Gunderson, 39 Wn. App. 392, 400, 695 P.2d 128 (1985) (the court erred in balancing the equities by not taking into account the city was "egregiously negligent" in allowing construction of a house that violated the zoning code); Mahon v. Haas, 2 Wn. App. 560, 565, 468 P.2d 713 (1970) (the plaintiff erected a greenhouse after receiving the warning letter).

In balancing the equities, the court "is vested with considerable discretion" in weighing the factors and determining the relative hardship to the parties. Radach, 39 Wn. App. at 399.

11

Here, the court weighed the harm to Cool Beans in "tearing down a building" against the harm to White Water in "putting up with a different or eliminated drive area and reconfigured parking spaces." The court found that the delay in filing the lawsuit "strongly suggests" the property owner had not "suffered a great deal of harm." The court also considered the reduced purchase price White Water negotiated for Parcel II, concluding the discount sufficiently addressed any damages they may have suffered.

The court ruled, in pertinent part:

[D]isproportionality of harm to the defendant is a little overwhelming to the Court in this case.
    The difference between the harm to tearing down a building and the harm to putting up with a different or eliminated drive area and reconfigured parking spaces pales in comparison.
    It seems to me as well that the fact that plaintiff did not feel the need to dash into court for eight years strongly suggests that they haven't suffered a great deal of harm.
    I will also point out that I think there is case law and interesting case law indicating that, to the extent that they feel they have been damaged, that was addressed by their ability to negotiate a reduced purchase price for their property because they knew about the situation they were going into when they bought.
    Really with regard to the equitable remedy that makes this for plaintiff under the 10-year statute, it seems to me clear that [an injunction] would result in overly harsh results to the defendant after major delay by plaintiffs in bringing this action and the documented benefit to the plaintiff in reduction of [the] purchase price because, in part, of the difference between the footprint and the REA.

The court did not abuse its discretion in balancing the equities and denying the request for injunctive relief. The 2004 construction eliminated one of two shared drive aisles and reconfigured parking spaces, but the overall number of shared parking spaces did not change. The court ruled that when compared to the hardship of tearing down a permanent structure, the hardship of losing the right to access one of the drive

12

aisles "pales in comparison."[7] The record supports the determination that removal of the Starbucks building would result in disproportionate harm to Cool Beans.

We affirm.

WE CONCUR:

---

[7] For the first time on appeal and without citation to authority, White Water argues we should terminate the REA. On review of a summary judgment order, we do not consider arguments that were not "called to the attention of the trial court." RAP 9.12; Silverhawk, LLC v. KeyBank Nat'l Ass'n, 165 Wn. App. 258, 265-66, 268 P.3d 958 (2011). We also do not consider arguments that a party does not support with citation to authority. RAP 10.3(a)(6); Saviano v. Westport Amusements, Inc., 144 Wn. App. 72, 84, 180 P.3d 874 (2008). Nonetheless, the record does not support the argument that White Water asked the trial court to terminate the REA. The record shows that White Water requested removal of the Starbucks building or modification of the REA to allow a "similar deviation" from the Building Areas. White Water asserts that it used the terms "modification, reformation, [and] termination" interchangeably, but the record shows White Water argued in its motion for summary judgment that the court should "modify rather than terminate" an easement when it is "impossible as a practical matter" to enforce the terms of the easement. (Emphasis added.)