**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 11, 2021

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 11, 2021

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| LINCOLN C. BEAUREGARD,<br><br>Respondent,<br><br>v.<br><br>WASHINGTON STATE BAR ASSOCIATION, a statutorily created entity,<br><br>Petitioner. | NO. 97249-4<br><br>EN BANC<br><br>Filed: February 11, 2021 |

GORDON McCLOUD, J.—The Washington State Bar Association (WSBA) Board of Governors (BOG) terminated the WSBA executive director during a closed executive session. WSBA member Lincoln C. Beauregard sued the WSBA, alleging that the vote to fire the executive director violated the Open Public Meetings Act (OPMA), chapter 42.30 RCW. He demanded that the executive director be reinstated. The trial court held that the OPMA applied to the WSBA and granted Beauregard a preliminary injunction, but not for the requested relief of

*Beauregard v. WSBA*, No. 97249-4

reinstating the executive director. Instead, the injunction required the WSBA to comply with the OPMA.

Because the OPMA does not apply to the WSBA and because the superior court ordered relief that Beauregard never requested, we reverse the preliminary injunction.

FACTS AND PROCEDURAL HISTORY

In January 2019, the WSBA terminated executive director Paula Littlewood. Clerk's Papers (CP) at 120. It took this action during an "executive session" closed to the public, explaining only that the reason for the termination was to go in a "new direction." *Id.*

The BOG repeated its vote during a public meeting on March 7, 2019. *Id.* It provided no further reasons for the termination. *Id.* Many WSBA members stated their support for Littlewood and questioned the legitimacy of her termination. *See* CP at 156-328 (messages of support for Littlewood); *see also* CP at 13-14 (letter from three justices of this court urging the BOG "to rescind its unwise decision to terminate Paula Littlewood"). Littlewood's final day as executive director was set as March 31, 2019. CP at 469.

Two days after the March 7 meeting, Beauregard sued the WSBA, alleging that it had violated both the OPMA and the WSBA's own bylaws. CP at 1-12. He claimed that the BOG must "take all actions, including quorum deliberations and

*Beauregard v. WSBA*, No. 97249-4

voting, in open and for full view of the public." CP at 11. Beauregard moved the court to order the BOG to reinstate Littlewood as executive director and implement transparency training requirements for WSBA governors. *Id.*

Four days after filing, Beauregard moved for a preliminary injunction. CP at 15. He sought to enjoin the BOG from removing Littlewood as executive director pending final resolution of the lawsuit. *Id.* At oral argument on the motion, Beauregard reiterated this specific request for relief: "[W]e're asking that the Court reinstate Paula Littlewood. That's the relief that's available under either the bylaws or the [OPMA], which we'll litigate the merits of as we move forward." Hr'g at 5. Beauregard argued that if the court denied him this relief, "this lawsuit is over because Paula Littlewood is going to get hired by somebody else . . . and it's going to become inconceivable for us to get relief, relief in the form of an appropriate process wherein Ms. Littlewood might stay, might go." *Id.* at 31. Neither in his written motion nor at oral argument on his motion did Beauregard request any relief other than a preliminary injunction barring the WSBA from terminating Littlewood. CP at 15-25; Hr'g at 3-19, 30-31.

The trial court granted Beauregard a preliminary injunction, but not the one he sought. It ruled that the OPMA applied to the WSBA. CP at 478. It continued that Beauregard, as a Bar member, therefore had a clear equitable right to "know the basis for a BOG decision that may affect him, including why an [executive

3

director] may have been terminated." CP at 480. The court concluded that the substantial harm that could flow from invasion of that right was sufficient to support issuance of a preliminary injunction. CP at 481.

But the court then took a turn. It held that it lacked "the equitable power" to reinstate Littlewood as executive director. CP at 482. Instead, the court "enjoin[ed] the [Board] to comply with the OPMA moving forward," including with regard to any efforts to hire a new executive director. *Id.* It also ordered the Board to "comply with the OPMA as it relates to any correspondence among BOG members about the firing of Ms. Littlewood." *Id.* The trial court later clarified that its order required

> compliance with the OPMA as it related to any past correspondence. The Court intended for Defendants to retroactively comply with the OPMA in terms of any private meetings that, under the OPMA, should have been open. If private correspondence exists which, under the OPMA, should have been public (i.e., email votes, notes or minutes of private meetings, video of private meetings, etc.) with regard to Ms. Littlewood's firing. It should be made public now.

CP at 465.

The WSBA moved for discretionary review in this court. Specifically, the WSBA requested that we review "[w]hether the WSBA . . . is a 'public agency' subject to the OPMA, and, if so, whether the Respondent satisfied the three-prong test for a preliminary injunction under CR 65, and whether potential disclosure of confidential executive session correspondence is an appropriate remedy under the

4

*Beauregard v. WSBA*, No. 97249-4

OPMA." Mot. for Discr. Review at 4-5. Our commissioner granted review[1] and

we now reverse.

ANALYSIS

This case is before us on interlocutory review of a preliminary injunction.

"A party seeking preliminary injunctive relief must establish (1) a clear legal or

equitable right, (2) a well-grounded fear of immediate invasion of that right, and

(3) that the acts complained of either have or will result in actual and substantial

injury." *San Juan County v. No New Gas Tax*, 160 Wn.2d 141, 153, 157 P.3d 831

(2007) (citing *Wash. Fed'n of State Emps. v. State*, 99 Wn.2d 878, 888, 665 P.2d

1337 (1983)); *see* RCW 7.40.020. We review a trial court's decision on a

preliminary injunction for an abuse of discretion. *Huff v. Wyman*, 184 Wn.2d 643,

---

[1] To be clear, this court did *not* grant review of the merits of misconduct allegations against a former WSBA BOG member. Ruling Granting Direct Discr. Review (Wash. Aug. 27, 2019). The dissent has not identified any connection between those allegations and Littlewood's firing, much less a connection between those allegations and any issue actually before this court. There has not been full adversarial development of the record on the allegations and nothing about the dissent's argument on this point informs our interpretation of the OPMA or the constitution. Because of that, this court *denied* Beauregard's request to expand the record in this court with additional hearsay materials concerning that allegation. Order on Mot. to Suppl. Record (Wash. May 28, 2020). Nevertheless, the dissent spends a good deal of time arguing its position on this matter. Dissent at 11-13. The dissent bases its position on secondhand sources: mainly Beauregard's own complaint and various letters and petitions from WSBA members and employees. While this context (if fully and fairly developed) might certainly inform a decision by this court on the policy matter on which the dissent opines—of increasing WSBA transparency in the future through rulemaking or other means—it is not relevant to the requirements for a preliminary injunction or the reach of the OPMA. Yet those are the issues on which we granted review.

5

648, 361 P.3d 727 (2015) (citing *Wash. Fed'n of State Emps.*, 99 Wn.2d at 887).

An abuse of discretion occurs if "the trial court's decision is based on untenable grounds, is manifestly unreasonable, or is arbitrary." *Fed. Way Family Physicians, Inc. v. Tacoma Stands Up For Life*, 106 Wn.2d 261, 264, 721 P.2d 946 (1986) (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

I.     THE BAR ASSOCIATION IS NOT A "PUBLIC AGENCY" UNDER THE OPEN PUBLIC MEETINGS ACT; BEAUREGARD THEREFORE FAILS TO ESTABLISH A CLEAR LEGAL OR EQUITABLE RIGHT TO A PRELIMINARY INJUNCTION

As discussed immediately above, to obtain a preliminary injunction, Beauregard had to show a "clear legal or equitable right." *Huff*, 184 Wn.2d at 652. In deciding whether such a right exists, we "'examine[] the likelihood that the moving party will prevail on the merits.'" *Id.* (quoting *Rabon v. City of Seattle*, 135 Wn.2d 278, 285, 957 P.2d 621 (1998)).

The alleged "clear equitable right" in this case is "WSBA member Beauregard's right to know the basis for a BOG decision that may affect him, including why an [executive director] may have been terminated." CP at 480. The trial court identified the OPMA as the source of this right. *Id.* No other legal or equitable bases for this right were identified, Accordingly, if the OPMA does not apply to the WSBA at all, then Beauregard has no clear legal or equitable right to a preliminary injunction under part one of the three-part preliminary injunction test.

*Beauregard v. WSBA*, No. 97249-4

A. *THE WSBA IS NOT A "PUBLIC AGENCY" UNDER THE OPMA BECAUSE IT EXISTED AS A VOLUNTARY ASSOCIATION BEFORE ADOPTION OF THE STATE BAR ACT;*[2] *THUS, THE WSBA WAS NOT "CREATED BY OR PURSUANT TO STATUTE"*

"The OPMA is Washington's comprehensive transparency statute.  Enacted in 1971, the Act seeks 'to ensure public bodies make decisions openly.'  '[T]he purpose of the Act is to allow the public to view the decisionmaking process at all stages.'"  *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 421, 434, 395 P.3d 1031 (2017) (alteration in original) (footnotes and citation omitted) (quoting *Miller v. City of Tacoma*, 138 Wn.2d 318, 324, 979 P.2d 429 (1999); *Cathcart v. Andersen*, 85 Wn.2d 102, 107, 530 P.2d 313 (1975)).  To achieve this goal, the OPMA requires that "[a]ll meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency, except as otherwise provided in this chapter."  RCW 42.30.030.  Thus, the OPMA applies to each "governing body" of a "public agency."

The OPMA defines "public agency" as "[a]ny state board, commission, committee, department, educational institution, or other state agency which is

_____

[2] RCW 2.48.010.

7

*Beauregard v. WSBA*, No. 97249-4

created by or pursuant to statute, other than courts and the legislature." RCW

42.30.020(1)(a).[3]

We have interpreted "pursuant to" in this context to mean "in conformity

with or in the course of carrying out, implying that what is done is in accordance

with an instruction or direction." *Cathcart*, 85 Wn.2d at 104 (citing *Knowles v.*

*Holly*, 82 Wn.2d 694, 702, 513 P.2d 18 (1973)).

The state bar act of 1933 purported to "create[] as an agency of the state, for

the purpose and with the powers hereinafter set forth, an association to be known

as the [WSBA]."[4] RCW 2.48.010. That statute also provided for the election and

powers of the BOG. RCW 2.48.020-50.

But the WSBA existed long before that statute was passed. *Graham v. State*

*Bar Ass'n*, 86 Wn.2d 624, 626-27, 548 P.2d 310 (1976) ("The [WSBA] existed as

a voluntary professional association between 1888 and 1933."); CP at 467 ("'The

[WSBA] was formed in January 1888, during the final year of the Washington

---

[3] The OPMA's definition of "agency" expressly excludes "courts." Clearly, the WSBA is not "a court."

[4] Though the statute refers to the WSBA as an "agency of the state," we have held that the WSBA is not an "agency" in other contexts. *Graham v. State Bar Ass'n*, 86 Wn.2d 624, 626, 548 P.2d 310 (1976) ("[T]he reference to the bar association as 'an agency of the state' in the State Bar Act of 1933 does not control the applicability of the auditing statutes to that organization."); *Nast v. Michels*, 107 Wn.2d 300, 305, 730 P.2d 54 (1986) (King County Department of Judicial Administration not an "agency" under the Public Records Act, even though "by its name" it fell "within the definition of agency"). Thus, the "agency" language in the state bar act is not determinative of whether the WSBA is an "agency" under the OPMA.

8

*Beauregard v. WSBA*, No. 97249-4

Territory.'" (quoting https://www.wsba.org/about-wsba/who-we-are/history-of-the-wsba); John N. Rupp, *An Essay in History: 1933-1983 The First Fifty Years of the Washington State Bar Association*, 37 WASH. ST. B. NEWS, June 1983, at 29 ("The origin of our Bar Association goes back to Territorial times when, on January 19, 1888, a year before Statehood, some 35 young lawyers got together in the Supreme Court's room in Olympia and formed a bar association."); *Bar Association Affairs*, 11 WASH L. REV. & ST. B.J. 238, 239 (1936) ("The [WSBA] has reached the period in the forty-eight years of its existence when it may now be said to have traditions." (quoting 1936 annual address by WSBA President L.R. Hamblen)); *Our State Bar Associations: The Washington State Bar Association*, 48 AM. BAR ASS'N 71, 71 (1962) ("A voluntary association up to 1933, [the WSBA] then became integrated as a state agency by legislative enactment with compulsory dues from all practicing members, then numbering about 2700. This was a great advance from a small beginning in 1888, one year before statehood.").

Indeed, the preexisting WSBA was a driving force behind the state bar act's passage. *See Progress of Bar Integration Movement*, 17 J. AM. JUD. SOC. 69, 70 (1933) ("The [WSBA], leader in the federation movement, had no difficulty in securing enactment."); *Our State Bar Associations*, *supra*, at 71 ("At the annual meeting in August 1932, the Washington Bar endorsed an integrated bar act and

9

*Beauregard v. WSBA*, No. 97249-4

instructed its committees to work for its passage in the state legislative sessions of 1933.").

The state bar act made WSBA membership mandatory for the practice of law. RCW 2.48.170; *see also State ex rel. Foster v. Wash. State Bar Ass'n*, 23 Wn.2d 800, 805, 162 P.2d 261 (1945) ("The state bar act . . . provides that no person may engage in the practice of law in this state unless and until he becomes a member of the state bar association."). It also listed additional powers and responsibilities for the WSBA. *See, e.g.*, RCW 2.48.050, .060, .130. But the state bar act did not create the WSBA.

Because the WSBA existed as a voluntary association prior to the 1933 statute, it was not created "pursuant to statute."[5] Thus, it is not a "public agency" under the OPMA.[6]

---

[5] The dissent relies on *Cathcart*'s broad reading of pursuant to, which held that "[i]t is not necessary that a statute expressly create a subagency so long as there is an enabling provision which allows that subagency to come into existence, at some future date, as the need may arise." 85 Wn.2d at 104-05. Unlike the University of Washington, at issue in *Cathcart*, 85 Wn.2d at 105, the WSBA is not a "subagency" created by or pursuant to statute. The WSBA predated the state bar act by more than 40 years and operates pursuant to this court's authority to regulate the practice of law.

[6] Because the WSBA was not created pursuant to statute, we need not decide whether the legislature could subject it to the OPMA without encroaching on the constitution's separation of powers. *See Wash. State Bar Ass'n v. State*, 125 Wn.2d 901, 906, 890 P.2d 1047 (1995) ("Legislation which directly and unavoidably conflicts with a rule of court governing Bar Association powers and responsibilities is unconstitutional as it violates the separation of powers doctrine."); *Graham*, 86 Wn.2d at 633 (subjecting the WSBA to a state audit would be "an unwarranted and unconstitutional interference with

10

*Beauregard v. WSBA*, No. 97249-4

The trial court reached the opposite conclusion. It relied in part on a 1971 attorney general letter opinion that concluded that the WSBA is a "public agency" under the OPMA. CP at 476-77 (citing 1971 Letter Op. Att'y Gen. No. 103, at 2). Beauregard continues to rely on this opinion on appeal. But that opinion offered minimal analysis and does not even consider whether the WSBA was created "pursuant to a statute." 1971 Letter Op. Att'y Gen. No. 103. Instead, it relies almost exclusively on a 1969 state auditor opinion and the state bar act's usage of the term "agency of the state." *Id.* We rejected that very same state auditor opinion in *Graham*. 86 Wn.2d at 625. In that case, we held that the legislature had not intended to subject the WSBA to the authority of the state auditor, despite the label "agency of the state." *Id.* at 633. The letter opinion's reasoning is thus largely obsolete and its conclusion is incorrect.[7]

---

the power of this separate branch of government to make necessary rules and regulations governing the conduct of the bar").

[7] Individual legislators in 1971 also opined as to the OPMA's applicability to the WSBA. But different legislators took different positions. The sponsor of bill stated that because the WSBA is not supported by public funds, "[i]t was my impression and my feeling that they would not be covered and it was not the intention of the sponsors of the bill that an agency of that kind be covered." Senate Journal, 42d Leg., Reg. Sess., at 798 (Wash. 1971). Then, another senator asked a different senator, who was an attorney, whether the OPMA would apply to the WSBA. *Id.* He responded, "Yes, that would be my understanding of the law if this bill would be passed and that would be my intent upon voting upon it." *Id.* The legislative history is thus unhelpful in ascertaining the legislature's intent. *See State ex rel. Citizens Against Tolls (CAT) v. Murphy*, 151 Wn.2d 226, 238, 88 P.3d 375 (2004) ("The interpretation of a statute by an individual legislator does not show legislative intent." (citing *Scott v. Cascade Structures*, 100 Wn.2d 537, 544, 673 P.2d 179 (1983)).

11

*Beauregard v. WSBA*, No. 97249-4

> B. *THE WSBA IS NOT A "PUBLIC AGENCY" UNDER THE OPMA BECAUSE IT OPERATES PURSUANT TO THIS COURT'S AUTHORITY TO REGULATE THE PRACTICE OF LAW IN WASHINGTON; ONCE AGAIN, THAT MEANS THE WSBA WAS NOT "CREATED BY OR PURSUANT TO" STATUTE*

This court has the power and the responsibility to regulate the practice of law in Washington and to supervise the WSBA.[8] GR 12 ("The Washington Supreme Court has inherent and plenary authority to regulate the practice of law in Washington."); GR 12.2 ("In the exercise of its inherent and plenary authority to regulate the practice of law in Washington, the Supreme Court authorizes and supervises the [WSBA's] activities."). The state bar act itself "expressly recognized the primacy of the court in the area of admissions and disbarment when it made the board's power subject to the approval of the Supreme Court under RCW 2.48.060." *In re Application of Schatz*, 80 Wn.2d 604, 607, 497 P.2d 153 (1972). The statute "clearly lodges all ultimate authority in the Supreme Court." *Id.* Thus, "[t]he Board of Governors, acting in this area, is an arm of the court, independent of legislative direction." *Id.*

---

[8] The dissent posits that our regulation of the practice of law is distinct from the regulation of other professionals "[b]ecause of the legal profession's close relationship to the processes of government and law enforcement." Dissent at 2-3 (citing Rules of Professional Conduct pmbl. ¶ 10). But judicial authority over the practice of law is more than good policy—it is a core constitutional characteristic of American and Washingtonian government embodied in the separation of powers. *See, e.g.*, THE FEDERALIST NO. 78 (Alexander Hamilton) ("The complete independence of the courts of justice is peculiarly essential in a limited Constitution."); *Hagan & Van Camp, PS v. Kassler Escrow, Inc.*, 96 Wn.2d 443, 445, 635 P.2d 730 (1981) (Under Washington Constitution art. 4, § 1, "the Supreme Court is given the exclusive power to regulate the practice of law.").

12

*Beauregard v. WSBA*, No. 97249-4

We have come to the same conclusion about other administrative areas of bar activity. For example, in *Washington State Bar Association v. State*, 125 Wn.2d 901, 907-08, 890 P.2d 1047 (1995) (*WSBA*), we considered the constitutionality of a collective bargaining statute that directly and unavoidably conflicted with a court rule governing Bar Association powers and responsibilities. We held that our "control over Bar Association functions is not limited to admissions and discipline of lawyers." *Id.* at 907-08. Rather, that control "extends to ancillary administrative functions as well." *Id.* at 908.[9]

This court's control over WSBA "ancillary administrative functions" and supervision of WSBA activities thus also shows that the WSBA functions not "pursuant to" statute but, instead, pursuant to this court's authority to regulate the practice of law.

---

[9] To be sure, "it is sometimes possible to have an overlap of responsibility in governing the administrative aspects of court-related functions." *WSBA*, 125 Wn.2d at 908). In *Zylstra v. Piva*, we held that juvenile court employees had a "dual status" for collective bargaining purposes—their negotiations with the county regarding wages and benefits were "appropriately controlled by the provisions of the bargaining act," while their "hiring, firing, working conditions, and other matters" remained within the control of the juvenile court judges. 85 Wn.2d 743, 748, 539 P.2d 823 (1975). "Nothing in [this] approach diminishe[d] the final control of the judiciary over all necessary court functions." *Id.* Indeed, if "the county refused adequate salary funds, the court would be both obliged and empowered to protect its proper functioning and see to the effective administration of justice." *Id.* at 748-49 (citing *O'Coins, Inc. v. Treasurer*, 362 Mass. 507, 287 N.E.2d 608, 612 (1972)).

#### C. *WSBA Rules with Requirements Similar to Those of the OPMA Are Irrelevant to the Issue of Whether the WSBA Is a "Public Agency"*

Beauregard contends that the BOG "has already incorporated essentially the exact same transparency mandates [as under the OPMA] into the existing Bylaws." Resp't Lincoln Beauregard's Resp. to Opening Br. at 19. He argues that, because the WSBA already must effectively comply with the OPMA pursuant to its own bylaws, extending the OPMA to the WSBA would provide an enforcement mechanism for members and the public. *Id.* at 22.

It is true that the WSBA bylaws provide that "[a]ll meetings of the BOG or other Bar entity must be open and public and all persons will be permitted to attend any meeting, except as otherwise provided in these Bylaws or under court rules." CP at 96. Additionally, "[m]inutes of all meetings, except for executive sessions, must be recorded and approved minutes will be open to public inspection upon request" and most secret ballot voting is prohibited. *Id.*

But these transparency rules exist independently from the OPMA. They do not incorporate the OPMA, either explicitly or implicitly.[10]

---

[10] The dissent argues that transparency is a positive value and that it would go far toward maintaining the WSBA's accountability. Dissent at 2-3, 12-14. That might well be correct, as a policy matter. But the dissent proposes to achieve that policy goal in an unprecedented manner. It asserts that we should use our constitutional authority to regulate the practice of law to adopt the policy of WSBA transparency akin to what the OPMA requires through this decision, even if statutory and constitutional interpretation do not support it. Dissent at 11 (proposing to interpret the OPMA to apply to the WSBA BOG regardless of usual statutory interpretation "as a matter of public policy"). Alternatively, the dissent asserts that our separation of powers system has failed and

*Beauregard v. WSBA*, No. 97249-4

Because the WSBA is not a "public agency" under the OPMA, Beauregard

fails the first part of the three-part test for using a preliminary injunction:  he did

not establish a clear legal or equitable right to relief.  The trial court therefore

abused its discretion by issuing a preliminary injunction.

II.      THE TRIAL COURT ENJOINED CONDUCT THAT BEAUREGARD DID NOT SEEK
         TO ENJOIN; IN THIS CASE, THAT WAS ALSO AN ABUSE OF DISCRETION

The trial court erred in granting this particular preliminary injunction for

another reason, also:  the relief that the trial court ordered was not the relief that

Beauregard requested.

Beauregard acknowledges that the trial court enjoined conduct that he did

not seek to enjoin.  Resp't Lincoln Beauregard's Resp. to Opening Br. at 1; Wash.

Supreme Court oral argument, *Beauregard v. Wash. State Bar Ass'n*, No. 97249-4

(June 23, 2020), at 20 min., 22 sec., *audio recording by* TVW, Washington State's

Public Affairs Network, http://www.tvw.org ("As the litigant, it's not my primary

role; it wasn't my primary goal to obtain that particular relief.").

Trial courts must certainly pay careful attention to the relief that the movant

requests.  That helps give meaning to the rule requiring that motions "state with

---

entreats the legislature to take over our constitutional duties.  Dissent at 14.  We share the
dissent's concern for transparency in the WSBA BOG.  And if public policy requires
additional transparency, both this court and the BOG can pursue it through other means.
But those regulatory and rule-making means are not tools of statutory interpretation to
decide a pending case.

15

particularity the grounds therefor, and *shall set forth the relief or order sought*."

CR 7(b)(1) (emphasis added). "The purpose of a motion under the civil rules is to

give the other party notice of the *relief sought*." *Pamelin Indus., Inc. v. Sheen-*

*U.S.A., Inc.*, 95 Wn.2d 398, 402, 622 P.2d 1270 (1981) (trial court could provide

relief on a discovery motion in part because that plaintiffs' motion "state[d] the

relief sought and the grounds justifying relief" and "the relief granted by the court

did not exceed the scope of the motion." (citing CR 7(b)(1))).

In this case, the trial court did not grant the relief that Beauregard "sought."

Instead, it ordered relief that no party argued or proved was necessary to avoid

"immediate invasion of . . . [the identified] right" or "actual and substantial injury,"

the other two prerequisites to preliminary injunctive relief. *San Juan County*, 160

Wn.2d at 153 (citing *Wash. Fed'n of State Emps.*, 99 Wn.2d at 888).[11] The trial

court's decision to enter this particular injunction thus constituted an abuse of

discretion for this reason also.

---

[11] Beauregard further contends that the WSBA "is actively defying the trial court's order" and has "never produced *any* of the information as ordered by the trial court." Resp't Lincoln Beauregard's Resp. to Opening Br. at 15 & n.38, 27 (citing ch. 7.21 RCW). The WSBA vehemently disagrees. Whether the WSBA is or was in contempt of the preliminary injunction is not an issue before this court, and we do not address it.

16

*Beauregard v. WSBA*, No. 97249-4

CONCLUSION

The OPMA does not apply to the WSBA. The trial court abused its

discretion by granting the preliminary injunction. We vacate that injunction and

remand for further proceedings consistent with this opinion.

_____
Gordon McCloud, J.

WE CONCUR:

_____          _____
González, C.J.                                        Montoya-Lewis, J.

_____          _____
Johnson, J.                                           Whitener, J.

_____          _____
                                                     Bjorgen, J.P.T.

_____          _____
Stephens, J.                                         Korsmo, J.P.T.

17

*Beauregard v. Wash. State Bar Ass'n*

No. 97249-4

MADSEN, J. (dissenting)—The practice of law is largely self governing. *E.g.*, Rules of Professional Conduct (RPC) pmbl. ¶ 10. Though subject to modest constraints,[1] the legal profession keeps its own house—lawyers regulate lawyers. *Id*. ¶¶ 10, 6 ("A lawyer . . . should help the bar regulate itself in the public interest."); *In re Disciplinary Proceeding Against Scannell*, 169 Wn.2d 723, 748, 239 P.3d 332 (2010) (recognizing the "self-governing nature of the practice of law"). The autonomy of the legal profession carries with it "special responsibilities of self-government." RPC pmbl. ¶ 12. Among the most important of these responsibilities is service to the public. *See id*. ¶¶ 12, 13; *In re Disciplinary Proceeding Against Huddleston*, 137 Wn.2d 560, 573, 974 P.2d 325 (1999) ("[L]awyers owe an ethical duty [to their clients,] to the legal system, to the legal profession, and to the *general public*." (emphasis added)).

It is the mission of the Washington State Bar Association (WSBA) to protect and serve the public by regulating legal practitioners in the state. *Who We Are*, WASH. ST. B.

---

[1] Such constraints are professional and ethical rules, state licensure requirements, and disciplinary action by the courts.

No. 97249-4
Madsen, J., dissenting

Ass'n, https://www.wsba.org/about-wsba/who-we-are [https://perma.cc/D5T4-78F8];

Clerk's Papers (CP) at 53 (WSBA Bylaws (I)(A)) (stating that WSBA carries out its

mission by, among other things, fostering goodwill between the legal profession and the

public and by administering admissions, regulation, and discipline of legal professions so

to protect the public).

To carry out this mission, WSBA, just as any other governing institution, must be

transparent. *See* RPC pmbl. ¶ 6 ("legal institutions in a constitutional democracy depend

on popular participation and support to maintain their authority"). Public access to

information about the conduct of government is a "precondition" of democracy and

essential to the legitimacy of government itself. Eugene Cerruti, *"Dancing in the*

*Courthouse": The First Amendment Right of Access Opens a New Round*, 29 U. RICH. L.

REV. 237, 304 (1995); *see also* WASH. CONST. art. I, § 1 ("All political power is inherent

in the people, and governments derive their just powers from the consent of the

governed."); *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 251,

884 P.2d 592 (1994) (plurality opinion) (quoting Letter to W.T. Barry (Aug. 4, 1822), in

THE WRITINGS OF JAMES MADISON: 1819-1836, at 103 (Gaillard Hunt ed., 1910) ("'A

popular Government without popular information, or the means of acquiring it, is but a

Prologue to a Farce or a Tragedy; or, perhaps both.'")).

Self-governance is unique to the practice of law. Other professions, from

accountants to nurses, are regulated and licensed by the State. *E.g.*, *List of Licenses*,

WASH. ST. DEP'T OF LICENSING, https://www.dol.wa.gov/listoflicenses.html

2

No. 97249-4
Madsen, J., dissenting

[https://perma.cc/M69H-UJTU]. Because of the legal profession's close relationship to the processes of government and law enforcement, we have been trusted to govern ourselves—making transparency all the more important. *See* RPC pmbl. ¶ 10. The judicial branch of government (as well as those who practice within it) must therefore regulate itself "in the public interest," not merely to further the self-interested concerns of the bar. *Id*. ¶ 12.

These are the "special responsibilities of self-government." *See id*. They are not aspirational. *Id.* ¶ 11. They are not empty words spoken to ward off threats of external control. *See id.* Rather, they are a bellwether for the legal profession—an institution invested with substantial public trust. *Id*. It is our responsibility and our privilege as lawyers to protect that trust. *Id*. ¶¶ 11-13. In short, we have promised those we serve to govern ourselves. To do so, then, with the public interest in mind, transparency is required. As the present case demonstrates, WSBA and its Board of Governors (BOG) have not fulfilled this ethical duty.

The majority holds that WSBA is not a public agency for the purposes of our state's open meetings act. Majority at 10. I disagree. In my view, the plain language of the Open Public Meetings Act of 1971 (OPMA), ch. 42.30 RCW, applies to WSBA and BOG. RCW 42.30.020(1). Even if it did not, this court should exercise its authority as leaders of the judicial branch to hold WSBA subject to the same transparency requirements as other governing entities. GR 12.2. Finally, absent existing binding legislation or the exercise of our plenary authority, we should call on the legislature to do

3

No. 97249-4
Madsen, J., dissenting

that which we are unable—amend the OPMA to include WSBA and BOG. Accordingly, I respectfully dissent.

## I. The OPMA applies to WSBA

The OPMA defines a public agency as "[a]ny state board, commission, committee, department, educational institution, or other state agency which is created by *or pursuant to statute*, other than courts and the legislature." RCW 42.30.020(1)(a) (emphasis added). We have interpreted the phrase "pursuant to" as meaning "in conformity with or in the course of carrying out, implying that what is done is in accordance with an instruction or direction." *Cathcart v. Andersen*, 85 Wn.2d 102, 104, 530 P.2d 313 (1975). The state bar act "created [WSBA] as an agency of the state, for the purpose and with the powers hereinafter set forth." RCW 2.48.010.

By its plain language, the OPMA applies to WSBA and, thus, to BOG. RCW 42.30.020(1)(a)'s "public agency" includes WSBA because it was created pursuant to the state bar act, ch. 2.48 RCW. Public agencies subject to the OPMA include not just those organizations created through direct legislation but also those created in the course of carrying out legislation. *See Cathcart*, 85 Wn.2d at 104. The state bar act of 1933 did not produce WSBA from whole cloth—on this point, the majority is correct. *See* majority at 10. But the OPMA does not require this.

The state bar act changed and formalized the earlier, voluntary bar association. *Wash. State Bar Ass'n v. State*, 125 Wn.2d 901, 907, 890 P.2d 1047 (1995). Originally, the bar consisted of 35 lawyers and did not include all attorneys admitted to practice in

4

No. 97249-4
Madsen, J., dissenting

the state. *History of the Bar*, WASH. ST. B. ASS'N, https://www.wsba.org/about-wsba/who-we-are/history-of-the-wsba#:~:text=Alfred%20J.&text=In%20this%20setting%2C%20a%20group,membership%20cost%20%245%20per%20year [https://perma.cc/UC5S-GF9Y]. The bar association itself worked to pass the state bar act. *Washington State Bar News—The Washington State Bar Association*, 23 WASH. ST. B. NEWS, Feb. 1969, at 9 ("At the annual meeting in August, 1932, the Washington Bar endorsed an integrated bar act and instructed its committees to work for its passage in the state legislative sessions of 1933."). The act made membership a prerequisite to practice law in Washington and created WSBA "as an agency of the state." RCW 2.48.010, .170. Today's WSBA did not exist prior to passage of the state bar act.

The majority's conclusion that the state bar act did not "create" WSBA is an unnecessarily narrow reading of RCW 42.30.020(1)(a). If RCW 42.30.020(1)(a) contained only the words "created by . . . [a] statute," then the state bar act would not qualify. But RCW 42.30.020(1)(a) also encompasses organizations created *pursuant to* a statute. Just as we cannot read words into a statute, so can we not read words *out* of a statute. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 114 Wn.2d 677, 688, 790 P.2d 604 (1990) (courts may not read into a statute matters that are not in it); *State v. Reis*, 183 Wn.2d 197, 217, 351 P.3d 127 (2015) ("This court does not have the authority to read language out of a statute."). Statutes must be interpreted so that all the language

5

No. 97249-4
Madsen, J., dissenting

used is given effect. *G-P Gypsum Corp. v. Dep't of Revenue*, 169 Wn.2d 304, 309, 237 P.3d 256 (2010).

Nothing in the OPMA indicates, as the majority's reasoning implies, that legislation must produce a completely new agency in order to be subject to the law's transparency requirements. Such a requirement would conflict with the expansive meaning of the phrase "pursuant to." *See Cathcart*, 85 Wn.2d at 104.

Moreover, WSBA is not a court. *See* majority at 11-13. It was not created under the auspices of this court, rather it is a sui generis[2] organization whose functions relate to and aid the judicial branch. *History of the Bar*, *supra*; *Graham v. State Bar Ass'n*, 86 Wn.2d 624, 632, 548 P.2d 310 (1976); WSBA BYLAWS 1, 19 (Oct. 7, 2020), https://www.wsba.org/docs/default-source/about-wsba/governance/proposed-bylaw-amendments/current-wsba-bylaws.pdf?sfvrsn=26cc0bf1_15 [https://perma.cc/DCJ4-KUEF]. This court works closely with WSBA to discipline lawyers, but ultimate authority resides with us. WASH. CONST. art. IV, § 1; GR 12.2 (the Supreme Court possesses the "inherent and plenary authority to regulate the practice of law in Washington").

Though we advise and are advised by WSBA, we do not select the individuals governing the bar. BOG consists of a president, governors from each congressional district, and three governors elected at large by the lawyers of Washington State. WSBA

---

[2] "Sui generis" is a Latin term meaning "[o]f its own kind or class; unique or peculiar." BLACK'S LAW DICTIONARY 1734 (11th ed. 2019).

6

No. 97249-4
Madsen, J., dissenting

BYLAWS at 19. BOG elects the president of the bar and selects the executive director. *Id.*

WSBA operates as an arm of the court to carry out only those duties "expressly

delegated" to it. GR 12.2. The privilege of disciplining lawyers has never been and

should not be afforded to WSBA. Indeed, the court could administer discipline directly

pursuant its own authority. GR 12. At the same time, we have no authority over the

nonlicensing, nondisciplinary matters of WSBA. *See Wash. State Bar Ass'n*, 125 Wn.2d

at 909 ("The ultimate power to regulate *court-related* functions, including the

administration of the Bar Association, belongs exclusively to this court." (emphasis

added)); GR 12.2 (this court authorizes and supervises WSBA carrying out its

administrative responsibilities).[3]

Nor is this court completely immune from public scrutiny. When operating in our

administrative role to promulgate rules, we are governed by GR 9 and 31. Courts must

also facilitate access to court records, and when making administrative rules, due notice

must be provided to all interested persons, as well as the opportunity to express views on

proposed rules through publication for comment. GR 31; GR 9(a)(2)-(3), (g).

In *Graham*, we rejected the notion that WSBA is an agency for the purposes of

auditing statutes. 86 Wn.2d at 633. This recognition does not, however, control our

holding today. *See* majority at 10. According to the majority, under *Graham* "the

---

[3] In 2019, lawmakers considered ESHB 1788, which would repeal relevant sections of the state bar act and transfer to this court all regulatory, licensing, and disciplinary functions concerning the practice of law and administration of justice currently administered by WSBA. S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 1788, 66th Leg., Reg. Sess. (Wash. 2019).

7

No. 97249-4
Madsen, J., dissenting

'agency' language in the state bar act is not determinative of whether the WSBA is an 'agency' under the OPMA." *Id.* at 8 n.4. But, *Graham*'s applicability is limited; its holding is specific to auditing statutes that allowed the executive branch to investigate the judicial branch. 86 Wn.2d at 625.

*Graham* reviewed the challenged auditing statutes, noting that they empowered legislative budget committees to audit other agencies while no legislative standards existed to bind BOG's discretionary actions such as the expenditure of funds. *Id.* at 627-28. If BOG mismanaged the bar's programs, then it was WSBA members, not the legislature, who would select new board members. *Id.* at 628. And, unlike other legislative committees, the legislature did not provide WSBA's operational funds. *Id.* at 629-30. *Graham* reasoned that "[p]ostaudits are performed to detect 'malfeasance, misfeasance, or nonfeasance in office'" and because of BOG's complete discretion in its duties (aside from bar admissions and discipline), an auditor had "no standards to determine whether malfeasance, misfeasance or nonfeasance" occurred. *Id.* at 630. The inability to fulfill the purposes of the auditing statutes demonstrated *legislative intent not to include WSBA* within their ambit. *Id.* Unlike *Graham*, the legislative intent of the OPMA is easily satisfied and the statutory language *plainly applies to WSBA*.

*Graham* also implicated an encroachment from one governmental branch into another that gave rise to separation of powers concerns. *Id.* at 631-33. The present case, however, concerns legislation mandating transparency from within (WSBA) rather than without (executive or legislative oversight).

8

No. 97249-4
Madsen, J., dissenting

In any event, even modest governmental encroachment does not necessitate the majority's holding here. Majority at 10. The separation of powers doctrine is integral to our conception of democratic government, but it is still a doctrine. The power of each branch to interfere with the exercise of another branch's power is limited and does not "'depend on the branches of government being hermetically sealed off from one another.'" *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009) (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)). Branches remain "partially intertwined" to facilitate and execute effective government. *Id.* The question is whether the activity of one branch threatens the independence or integrity or invades the prerogatives of another branch. *Zylstra v. Piva*, 85 Wn.2d 743, 750, 539 P.2d 823 (1975).

The legislative and the judicial branches often intertwine. Lawmakers routinely consider and enact statutes related to courts. *E.g.*, RCW 2.30.010 (recognizing the judiciary's inherent authority and encouraging the creating of therapeutic courts); ENGROSSED SUBSTITUTE H.B. 1788, 66th Leg., Reg. Sess. (Wash. 2019). Legislators sit on the advisory committee of the Office of Public Defense (OPD), which was established in 1996 to implement the constitutional and statutory guaranties to counsel. WASH. ST. OFF. OF PUB. DEF., https://www.opd.wa.gov/ [https://perma.cc/2J3T-HQ3K]; *OPD Advisory Committee*, WASH. ST. OFF. OF PUB. DEF., https://www.opd.wa.gov/about-opd/14-admin/23-advisory-committee (last visited Feb. 5, 2021). Despite existing as an independent agency of the judicial branch, the OPD operates in conjunction with both the

9

No. 97249-4
Madsen, J., dissenting

lawmaking and law-interpreting branches of government. As does the Office of Civil

Legal Aid (OCLA)—an independent judicial agency responsible for administering state

funds to provide civil legal aid services to low income individuals. *About OCLA*, OFF. OF

CIV. LEGAL AID, https://ocla.wa.gov/about-us/ [https://perma.cc/J4W5-FN9Q]. Like the

OPD, the Oversight Committee for OCLA consists of 11 members appointed by the

courts, the legislature, the governor, and the bar association. *Oversight Committee*, OFF.

OF CIV. LEGAL AID, https://ocla.wa.gov/oversight-committee/ (last visited Feb. 5, 2021).

The Administrative Office of the Courts provides critical services to the judicial

branch (budgeting, compiling court statistics, and maintaining the judicial information

system and statewide electronic court record database) and operates under the direction of

the chief justice. *Administrative Office of the Courts*, WASH. CTS.,

https://www.courts.wa.gov/appellate_trial_courts/aocwho/ (last visited Jan. 4, 2021).

This office is a frequent subject of legislation, such as changing the duties of the chief

administrative officer, *see* LAWS OF 2005, ch. 282, §§ 5, 7, and requiring standardized

court forms related to the uniform parentage act for access to court records, *see* LAWS OF

2019, ch. 46, § 1003. Separation of powers is not a concern in these instances and should

not be so now.

Ultimately, WSBA is not a part of the judiciary such that it is sequestered from

legislatively imposed transparency requirements. Only the courts, acting as courts, are

truly separated from the powers and potential encroachment from the executive or the

legislature. Though we must be circumspect, interpreting the OPMA to apply to WSBA

10

No. 97249-4
Madsen, J., dissenting

is not such an encroachment. I do not share the majority's concern and disagree with its reliance on the separation of powers to hold the OPMA inapplicable.

Requiring compliance with the OPMA facilitates the public purpose of the judiciary and WSBA. It does not invade the prerogative or independence of this court to direct the regulatory and licensing aspects of the bar. I would hold, therefore, that WSBA constitutes a public agency created pursuant to—that is, in the course of carrying out— RCW 42.30.020(1)(a) and is subject to the OPMA.

## II. The OPMA applies as a matter of public policy

Even if the court rejects the application of the OPMA, we should hold that the statute applies as a matter of public policy. WSBA and BOG have, unfortunately, demonstrated time and again the lack of transparency within the organization. The most recent example is the termination of Executive Director Paula Littlewood. At the March 7, 2019 meeting, BOG cast a public vote to formalize what had already occurred in private: terminating Littlewood as executive director. Board members Athan Papailiou and Alec Stephens noted that "[a]ll governors were prohibited from reporting the action, which had apparently been planned and orchestrated for some time." CP at 120. At least one board member publicly expressed frustration at BOG's actions, proclaiming he did not understand how the decision-making process unfolded. CP at 382. Even then-Executive Director Littlewood was unaware of the reasons for her termination. *See* CP at 395.

11

No. 97249-4
Madsen, J., dissenting

WSBA members were similarly nonplussed. One individual was "absolutely floored" after watching BOG's March 7 meeting, noting the "appalling" manner in which the termination occurred. CP at 274. Numerous WSBA members petitioned for Littlewood's reinstatement, echoing the consistent refrains that the termination occurred in the dark, "[w]ithout input from WSBA staff, WSBA members, or the Washington State Supreme Court." CP at 27; *see also* CP at 44 (resignation letter from Ken Masters (noting his resignation was "in protest of the secretive, unprincipled, and frankly inhuman manner in which the board summarily terminated the finest Executive Director of any organization whom I have ever known, Paula Littlewood")).

In 2016, a WSBA staff member accused Governor Dan'L Bridges of sexual harassment. CP at 4-5. An investigation found the allegations credible but instead of addressing the issue, BOG promoted Bridges to treasurer. *Id.*[4] BOG members reported they were told to stay silent about this decision. CP at 5. Once again, BOG elected secrecy and obfuscation over its duty not only to the public but to its own staff.[5]

In an open letter to BOG, over 20 WSBA employees expressed concern about Bridges' promotion. CP at 39. The employees noted that the promotion lacked oversight

---

[4] The staff member sued the WSBA for $150,000, and Bridges negotiated an out-of-court settlement. CP at 144-46.

[5] The majority criticizes the use of an "undeveloped" factual record based on Beauregard's allegations, asserting that I have not "identified any connection" between the allegations against BOG's former treasurer and the firing of Paula Littlewood. *See* majority at 5 n.1. The allegations against former Governor Bridges, the termination of Executive Director Littlewood, and the manner in which BOG handled them are relevant to this case because they are further evidence of BOG's lack of transparency—which should be considered as a matter of public policy.

No. 97249-4
Madsen, J., dissenting

and constituted an inappropriate response to the alleged sexual misconduct. The staff

also stated that BOG had not held itself accountable, ignored conflicts of interest, and

failed to exhibit courageous leadership, which resulted in low staff morale and concerns

for staff safety. *Id.* Past WSBA presidents echoed these concerns and disapproved of

BOG's response to the sexual harassment claim in an open letter to this court. CP at 42-

43. When BOG was asked to remove Bridges as treasurer, Governor Paul Swegle

defended Bridges by stating the credible sexual harassment allegation was a one-time,

"unfortunate incident." CP at 428. Bridges refused to resign, and BOG took no action.[6]

CP at 39.

BOG's lack of transparency has not gone unnoticed. Members of this court

commented on Littlewood's termination, noting the decision was inconsistent with past

actions in which task forces and workgroups were formed. CP at 29. We urged BOG to

make future decisions with "an open, transparent process that includes members of the

profession, [and] members of the public." *Id.* at 30. Former WSBA President Bill

Pickett identified this very concern in 2018, stating that meetings between select board

members had long concerned him, CP at 33, as did the public perception that BOG votes

were counted or traded in advance of public meetings. *Id.*[7]

---

[6] WSBA BOG Member and Public Comments (Jan. 2019) at 67 min., 25 sec., *video recording by* WSBA, *available at* https://link.videoplatform.limelight.com/media/?channelId=6413e629d22746ebb9829900af84d1 08&width=700&height=260&playerForm=48a6dcaeae1146748668b1840566a9d4&embedMode =html&htmlPlayerFilename=limelightjs-player.js&autoplay=false&autoplayNextClip=true.

[7] Dan'L Bridges defended the practice of meeting and counting votes prior to the public board meetings, insisting that the OPMA does not apply to WSBA. CP at 34-36.

13

No. 97249-4
Madsen, J., dissenting

The legal profession's unique autonomy has allowed BOG's disinterest in open and transparent governance. *See* RPC pmbl. ¶ 10. In no other professional area would BOG continue to operate in such a manner without swift intervention. This court's inability or unwillingness to take action, coupled with BOG's flimsy internal transparency requirements have created a perfect storm. BOG's actions behind closed doors have cost the lawyers of this state great amounts of money and, what is worse, shaken the public's trust in our profession. The majority's view has long been the view of this court. It did not prevent BOG's misconduct in the past and sadly will do nothing to prevent future missteps. To this, I cannot agree.

WSBA's purpose is a public one. The citizens of Washington have trusted us to govern ourselves, and to respect that investment we must do so transparently. As a matter of public policy, therefore, this court should conclude that the OPMA applies to the bar association and its governing body, BOG.

### III. Legislative action

If this court is unwilling to mandate transparency in the bar association, it is left to our state legislature to do so. As previously discussed, our duty as legal practitioners is to the public. Our significant authority and discretion as arbiters of the law function in the public interest only if exercised in public rather than in the backroom activities that have marked the WSBA's conduct in these past four years.[8]

---

[8] Controversy is not unique to our bar association. In California, the state bar had been so poorly managed and embroiled in scandal that state lawmakers took the drastic measure of separating the bar into discrete entities: a voluntary association engaging in advocacy and a mandatory body

14

No. 97249-4
Madsen, J., dissenting

Washington citizens memorialized their expectation that all levels of government operate transparently. *See* ch. 42.56 RCW (Public Records Act); ch. 42.30 RCW (OPMA). Because the legal profession in this state has failed to govern with this goal in mind, our lawmakers should extend the OPMA specifically to WSBA and BOG. It is the legal profession's obligation to regulate itself, but in its absence, the legislature must do it for us.[9]

## CONCLUSION

WSBA has struggled and, at times, failed to fulfill its duty to serve the public. The bar has shrouded its decisions from public view. Past and current BOG members, WSBA presidents, WSBA staff, and members of this court have sounded the alarm. The majority's unwillingness to require transparency in processes of legal self-governance does not protect the public, and will serve only to further erode confidence in our democratic institutions. At a time when trust in government is at historic lows,[10] the legal

---

focused on licensure and discipline. Lyle Moran, *California Split: 1 Year After Nation's Largest Bar Became 2 Entities, Observers See Positive Change*, ABA J. (Feb. 4, 2019), https://www.abajournal.com/web/article/california-split-1-year-after-californias-state-bar-became-2-entities-observers-see-positive-changes#:~:text=In%20California%2C%20then%2DGov.,become%20an%20independent%20nonprofit%20entity [https://perma.cc/FLP6-7WEX].

[9] The California legislature required its own bar association to abide by the state's open meetings law in 2015. *Gov. Brown Signs Senate Bill 387: CPIL Succeeds in Imposing Transparency Requirements on State Bar of California*, CTR. FOR PUB. INT. – UNIV. OF SAN DIEGO (Oct. 9, 2015), https://www.sandiego.edu/cpil/detail.php?_focus=52887 [https://perma.cc/T7QF-RK2A].

[10] Public trust in the federal government has fallen to just 20 percent. *Americans' View of Government: Low Trust, but Some Positive Performance Ratings*, PEW RES. CTR. (Sept. 14, 2020), https://www.pewresearch.org/politics/2020/09/14/americans-views-of-government-low-trust-but-some-positive-performance-ratings/ [https://perma.cc/EJ6X-6T6K]. Trust in state and local government, by contrast, ranks at over 60 percent. Justin McCarthy, *Americans Still More Trusting of Local than State Government*, GALLUP (Oct. 8, 2018),

15

No. 97249-4
Madsen, J., dissenting

profession should seek not to close the door to public scrutiny but, instead, to open it

further.  Because the majority's view has and will continue to allow WSBA to ignore its

ethical duty to operate openly and transparently, I respectfully dissent.

_____
Madsen, J.

---

https://news.gallup.com/poll/243563/americans-trusting-local-state-government.aspx
[https://perma.cc/4FUS-VPAW] (stating 72 percent of United States adults have a "great deal" or
"fair amount" of trust in local government and 63 percent who say the same about state
government).